## TWIN CITY METROPOLITAN PUBLIC TRANSIT AREA, ACTING BY AND THROUGH TWIN CITIES AREA METROPOLITAN TRANSIT COMMISSION, v. TWIN CITY LINES, INC., AND OTHERS.

224 N. W. 2d 121.

October 18, 1974—No. 44095.

*Popham, Haik, Schnobrich, Kaufman & Doty, David S. Doty, Raymond A. Haik,* and *Robert W. Junghans,* for appellant.

*O. C. Adamson II, James F. Roegge, David M. Levy, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Levy, Feldman & Licata,* and *Levitt, Palmer, Bowen, Bearmon & Rotman,* for respondents.

*Peterson, Bell & Converse, Erwin Peterson,* and *Willard L. Converse,* for Amalgamated Transit Union, Local Division 1005, amicus curiae.

YETKA, JUSTICE.

This is an appeal by the Twin Cities Metropolitan Public Transit Area, acting through its governing body, the Twin Cities Area Metropolitan Transit Commission, (hereafter MTC) from an order denying its motion for judgment n.o.v. or a new trial in condemnation proceedings. We reverse and remand to the district court for a new trial.

On December 24, 1969, MTC petitioned the district court under the provisions of Minn. St. 473A.05, subd. 7, to condemn the assets

of Twin City Lines, Inc., and its subsidiaries, Minneapolis Transit Company and St. Paul Transit Company (hereafter collectively referred to as TCL). On August 19, 1970, three court-appointed condemnation commissioners awarded damages of $6,510,000 to TCL for the taking of its assets.

On August 26, 1970, TCL moved the Hennepin County District Court for an order requiring the condemnation commissioners to disclose the type and amount of any offsets or deductions made in arriving at the award. The commissioners disclosed that reductions in the total value were made for past service pension liability, accrued vacations, accrued sick leave, outstanding tokens, and insurance payments for group life insurance and hospitalization coverage for pensioners.

A deposition given by a member of the commission disclosed that the commissioners had determined the gross value of TCL's assets to be $10,394,817. Deductions for offsets totaled $3,889,-619 and the fair market value was rounded to $6,510,000.

Both MTC and TCL appealed from the award of the commissioners and the trial de novo was commenced before a jury on September 11, 1972.

Evidence was offered during the trial as to the value of all of TCL's assets, both tangible and intangible, as well as all liabilities claimed as offsets by MTC. However, evidence of offsetting liabilities was withdrawn from the jury's consideration by instruction of the trial court. This instruction was as follows:

"* * * I have ruled, based upon rules of law, that all testimony and evidence relating to offsets or what have been referred to as offset liabilities, have been stricken from this case. You are, therefore, not to consider in your deliberations any evidence relating to such so-called offsets whether it be in the form of oral testimony from witnesses or contained in any exhibits that have been received in evidence."

The court further instructed the jury it could use two generally recognized methods of arriving at just compensation: the cost-of-

reproduction-new-less-depreciation method (RCNLD); and the capitalization-of-earnings method. The jury returned a general verdict of $10,136,700.

On appeal to this court, MTC claims that the jury should have been allowed to consider some $8.5 million in offsets for liabilities of TCL. These liabilities include $6,872,000 in unfunded pension liability, $125,000 for accrued vacations, $533,337 for accrued sick leave, $708,000 for continued life insurance coverage for pensioners, $257,000 for hospital and medical insurance for pensioners, and a stipulated amount of $19,413 for outstanding tokens.

TCL denies any liability for deficits in the pension fund. It is their position that the pension agreement between the union and the company was a "defined contribution plan" and not a "defined benefit plan." They assert that the plan required only that the company contribute a specified amount toward pensions and that nothing in the agreement obligated it to insure any specific benefits, as would a defined benefit plan. Moreoever, TCL contends that even if it is liable for the alleged underfunding of the pension plan, it is only liable to the extent of its two-thirds contribution. Two-thirds of the $6,872,000 by which MTC claims the plan is underfunded would be approximately $4.6 million.

MTC claims in the alternative that—

"* * * [w]hether the pension plan was a 'fixed contribution' or 'fixed benefit' plan has no effect on whether the plan would be considered in establishing the value of the business, although it may bear on *how* it would be considered, e. g., obligations of one type of plan may be given more weight in establishing the value of the business.

"A willing buyer would consider the pension obligation facts as they existed on August 19, 1970 and would determine the effect of those facts on the value of Twin City Lines Inc. as a going business concern."

The issues raised by this appeal are:

A. Whether the trial court erred in not permitting the jury to consider alleged offsetting liabilities of TCL in arriving at just compensation.

B. Whether expert opinion based upon the reproduction-cost-new-less-depreciation method of valuation is admissible where no deduction had been made for depreciation due to economic obsolescence.

C. Whether expert opinion based upon the RCNLD method of valuation is admissible where no evidence is offered that a prudent businessman would reproduce the assets valued.

D. Whether evidence of subsequent sales by MTC of condemned property which took place 14 months after date of taking is admissible in condemnation proceedings.

E. Whether evidence of the book value of a going concern is admissible in condemnation proceedings.

The trial court was bothered by this problem: Since there appeared no evidence of comparable sales, the jury could consider only two methods of valuation—the reproduction-cost-new-less-depreciation and the capitalization-of-earnings methods. The latter method of valuation has built into it some consideration of liabilities. We do not know from a general verdict which method was used, or whether both were, in fact, considered. The court, in withdrawing all of the offsets from the jury's consideration, erred.

Mr. Justice Mitchell, in the case of King v. Mpls. Union R. Co. 32 Minn. 224, 226, 20 N. W. 135, 136 (1884), stated the rule of damages in eminent domain proceedings which has been followed by this court for nearly a century:

"* * * [A]ny evidence is competent and any fact is proper to be considered which legitimately bears upon the question of the marketable value of the property. * * * The owner has a right to its value for the use for which it would bring the most in the market."

The pension liability arose by reason of arbitration between TCL and the Amalgamated Transit Union, Local Division No. 1005, and a separate retirement plan set up pursuant to the arbitration award. The existing pension plan was adopted in 1950. Article 6 of the plan provides for contributions to be made by both employer and employee which would be sufficient to fund the plan over a 40-year period. The employer was to contribute two-thirds and the employees one-third of the contributions toward the plan. The contributions were to be increased at different times reflecting changes in pension benefits. A portion of Article 6 states:

"The parties are agreed that the contributions to be made for the year 1952 and the following years shall be the annual amounts necessary (a) to fund the cost of current service credit for such year, and (b) to fund the accrued liability over a period of forty years."

Article 3 of the plan provided for a committee composed of three members representing employees and three members appointed by the company. As stated by the trial court:

"The Committee was authorized and empowered to from time to time employ actuaries, apparently for the purpose of determining the adequacy of the fund, to pay pension obligations as they might accrue. The Pension Committee then would from time to time make recommendations. These recommendations as based upon actuarial projections would be acted upon by both company and employees through the union representatives and through negotiations the amount that contributions might be changed from time to time. Contributions might be increased to satisfy in the minds of the Retirement Allowance Committee and other concerned people that there were adequate funds in the pension fund to provide for benefits to employees as they became eligible for retirement. This agreement from its inception was modified, as we all know, from time to time, but the percentage of contributions of employees and employer constantly remained the

same, one third by the employees and two thirds by the employer."

Article 7 of the plan then sets forth the retirement allowances, including minimum amounts that are to be paid, based on years of service and other factors.

Article 6.5 reads:

"All payments and benefits provided for in this Plan shall be made from the Fund and there shall be no obligation on the part of the Company or the Association to provide for payments of benefits from another source. The right of any employe to any portion of the Fund is limited to the rights herein specifically set forth in his behalf."

This section is meaningless if the company can nonetheless be required to pay additional money into the fund over and above that amount agreed upon from time to time by the retirement allowance committee composed of three persons appointed by the company and three persons appointed by the union to represent the employees.

Article 17.1 reads as follows:

"While it is the intent of the parties hereto to maintain an old-age retirement and disability allowance plan permanently, however, in the event the Plan is abandoned in the future, the Trustee shall determine the assets of the Fund and shall allocate them pursuant to the priority described in Article 17.2 as certified by the actuary employed by the Committee based on his valuation made as of the date of any such abandonment."

Article 18 provides that the plan as amended in 1950 shall be in effect until December 31, 1952, and shall be renewed for successive 3-year periods unless changed or amended. Article 17.2 provides for distribution of the funds to nonretired employees as well as pensioners if the plan is abandoned. Article 13 precludes TCL from ever receiving any refunds from any moneys

deposited under the plan. In addition, the plan had an arbitration clause (paragraph 18.2) whereby it was agreed that either party could seek any amendments or revisions and if no agreement was reached, that issue could be submitted to arbitration.

While we cannot reach the conclusion that there is an outright, absolute, legal obligation on the part of TCL to make a contribution to the pension fund to correct any underfunding, we are persuaded that if MTC is required to pay for the going-concern value of TCL, the existence of the pension agreement and the status of the pension fund should have been considered by the jury and it should have determined the effect of those factors on the value of TCL as a going concern.

Under the various articles of the plan to which we have referred, there does not appear to be any absolute legal liability for the underfunding as far as TCL is concerned. However, there is a contingent or potential liability which we shall discuss. Moreover, even if there were no contingent liability, the existence of the pension agreement and the condition of its fund nonetheless would have a relationship to market value where going concern is one of the elements used in arriving at that value.

We do not find an absolute liability because the underfunding, initially and continuously thereafter, resulted from the action or inaction of the pension committee comprised of an equal number of representatives of the company and of the employees. Any correction in the funding would require a contribution by the employees of one-third ($2.3 million) of the amount necessary. The employees, if faced with that decision, might or might not desire to make such a contribution immediately or even over a period of years. In addition, if the employees' representatives on the pension committee had voted in favor of greater contributions, the company's representatives might have created a stalemate. Presumably, the employees might then have requested arbitration to adopt amendments to the contract to avoid the stalemate. In light of the provision in Article 18 that after 1952 the agreement shall be renewed for successive 3-year periods unless

changed or amended, of Article 17.1 referring to abandonment, and of the fact that the pension committee through the years apparently has not seen fit to increase the contributions, any hypothetical prudent purchaser would have to take into account the possibility of the successor company having to raise its contributions. In this day and age, pensions are considered a way of life. Therefore, if the present pension plan were not in existence, a successor company would probably consider the possibility that, as a fringe benefit, in future negotiations it would have to establish a pension fund anyway. These possibilities and their effects on the market value should have been presented to the jury.

The contention of TCL that MTC is merely condemning assets, and not the entire capital stock of the company, and that as a consequence the status of the pension fund is not an appropriate item to be considered for a setoff is not sustainable in this case. TCL is not merely claiming for its damages the fair and reasonable market value of its assets but also asserts it is entitled to a substantial award of damages for going-concern value.[1] Because the status of the pension fund has a bearing on the transit company's going-concern value, its effect on market value should have been considered by the jury in this case.

TCL argues persuasively that MTC in any event would not be compelled to correct immediately the underfunding and would as a consequence have the use of the money it claims would be needed for that purpose.[2] It also contends that MTC has con-

---

[1] An award of damages for going-concern value is appropriate in this case and particularly so because the condemnor intends to carry on the business. See, State, by Mattson, v. Saugen, 283 Minn. 402, 413, 169 N. W. 2d 37, 45 (1969).

[2] The trial court stated: "Under the terms of this agreement, I cannot see that the successor company, the MTC, has any obligation to make an immediate payment to the pension fund of the amount that has been introduced as an offset liability in this trial, namely, the amount of $6,872,000. The purpose of the various actuarial studies that were made over a span of many years prior to this time were for the information

trol of the fare box and can correct any underfunding by charging higher fares.[3] These contentions and possibly others may

of this committee made up jointly of employees and employer selections to make recommendations, and then presumably from their recollections [sic] and based on actuarial studies, the union and its representatives and the company from time to time would renegotiate, as they did in the past, and make provisions for larger contributions, but at no time did this agreement indicate that other than the percentile contributions were there to be any other payments made. In other words, payments made into the fund were to be based on a formula which was agreed upon back in 1944, apparently, which gives rise to Exhibit 775, the so-called Twin City Lines employees retirement plan [as amended in 1950]. So that the MTC does not have any immediate obligation to pay any $6,872,000 into the Marquette National Bank by reason of the fact that on the basis of actuarial studies it appears projected into the future that this amount represents an underfunding, and this Court has, as I have indicated before, has read the cases that have been cited previously in support of inclusion of offsets, and in each and every case the distinguishing feature is that in those cases predominantly the payments were to be made not out of any segregated fund or pursuant to any limiting agreement such as we have here, but on an entirely different basis. So that the rights of the parties having been determined by their agreement with respect to pension, this Court now rules that the so-called offsetting item of pension liability is no longer a part of this lawsuit and should not be submitted to this jury."

[3] On this point, the court below stated: "In this case the transit system ceased to operate as Twin City Lines, in other words as I see the situation, Twin City Lines was in effect put out of the transit business insofar as the Twin Cities of Minneapolis and St. Paul were concerned by the takeover by MTC. Therefore, the contemplated revenue that would be a part, and the payroll formula which had been established, was no longer available to Twin City Lines to make any contributions into the fund. The revenue now is that of the successor to this business, the MTC. It now has the fare box and the revenue. It now has essentially taken over all the employees of the Twin City Lines, and it is chargeable with the same obligations as Twin City Lines had been, namely to pay 9.8 percent of the payroll on a monthly basis into this fund, and that is the obligation as this Court views it as of August 19, 1970, the date of takeover, or the day following that date."

be submitted to the jury, assuming competent evidence is adduced. Similarly, MTC may present evidence by experts as to the effect of the underfunding of the pension plan on the fair market value of TCL as a going concern.

We cannot accept MTC's contention that Minn. St. 473A.10 required it to continue the pension plan established by TCL.[4] That statute imposes such a requirement only if TCL had an obligation to continue the plan and under the circumstances in this case, to supply further funds to make up a part of the underfunding. If our conclusion is correct that there was no absolute

---

[4] As far as MTC is concerned, the Minnesota Legislature has required it to accept as its own obligations certain liabilities of TCL to their employees. At issue here is whether the pension fund deficiencies are a liability of TCL. Minn. St. 473A.10 provides as follows: "If the commission acquires an existing transit system, the commission shall assume and observe all existing labor contracts and pension obligations. All employees of such system except executive and administrative officers who are necessary for the operation thereof by the commission shall be transferred to and appointed as employees of the commission for the purposes of the transit system, subject to all the rights and benefits of sections 473A.01 to 473A.18. Such employees shall be given seniority credit and sick leave, vacation, insurance, and pension credits in accordance with the records or labor agreements from the acquired transit system. The commission shall assume the obligations of any transit system acquired by it with regard to wages, salaries, hours, working conditions, sick leave, health and welfare and pension or retirement provisions for employees. The commission and the employees, through their representatives for collective bargaining purposes, shall take whatever action may be necessary to have pension trust funds presently under the joint control of the acquired transportation system and the participating employees through their representatives transferred to the trust fund to be established, maintained and administered jointly by the commission and the participating employees through their representatives. No employee of any acquired transportation system who is transferred to a position with the commission shall by reason of such transfer be placed in any worse position with respect to workmen's compensation, pension, seniority, wages, sick leave, vacation, health and welfare insurance or any other benefits than he enjoyed as an employee of such acquired transportation system."

legal obligation on the part of TCL to cure the underfunding, this statute under the conditions contained in it should not be considered as a factor in determining the value of the transit company. However, the contention of MTC that the legislature did not intend by enacting this statute to relieve TCL of any obligations to its employees or to establish a different theory for evaluating the transit company is a correct assumption.

Several cases have been cited from other jurisdictions by counsel for both parties relative to the pension issue. These authorities, all decided under different fact situations and different statutes, are not particularly helpful here.

MTC contends that the trial court erred in allowing TCL to submit expert opinion of the value of some TCL buses based upon reproduction-cost-new-less-depreciation without making deductions for depreciation because of alleged economic obsolescence. This issue is one of foundation for the opinion of TCL's expert and reception of the evidence was within the discretion of the trial court. MTC had an opportunity to extensively cross-examine the expert witness of TCL and the jury could determine the weight to be given his testimony in view of that cross-examination. Further, it should be pointed out that TCL's expert, on the basis of physical and functional obsolescence, did depreciate 174 of these buses by 90 percent. We find no error.

MTC also contends that the trial court erred in admitting expert opinion based upon the RCNLD method of valuation where no evidence was offered that a prudent businessman would reproduce the assets. It appears that MTC has no solid authority on which to base this contention. The authorities cited by MTC all arose out of special fact situations involving Federal housing costs and depreciation for military housing projects constructed under war conditions. Again, the question is one of foundation for expert opinion and it does not appear that the trial court abused its discretion.

MTC claims the trial court erred in not allowing testimony of the sale price of some 100 buses sold by it 14 months after the

date of taking. Although no Minnesota case holds that evidence of value other than at the date of taking is inadmissible, it has been the general rule in Minnesota that damages in condemnation are measured by the value at the date of taking. Oronoco School Dist. v. Town of Oronoco, 170 Minn. 49, 212 N. W. 8 (1927); Ford Motor Co. v. City of Minneapolis, 143 Minn. 392, 173 N. W. 713 (1919); Conter v. St. Paul & S. C. R. Co. 22 Minn. 342 (1876). It appears that the trial court was essentially correct in reasoning that, while subsequent sales of adjacent or comparable property by third parties may, with proper foundation, sometimes be relevant, subsequent sale of condemned property by the condemning authority, as was done here, would be too prejudicial.

MTC contends that the trial court erred in ruling evidence of the book value of TCL's assets irrelevant. We find no error. The amount of evidence necessary to attempt to explain the intricacies of "book value" to the jury could take the trial so far afield that, when weighed against the probative value of the concept, its admission was not justified. It is difficult to find that the trial judge abused his discretion by ruling book value inadmissable and we find that he did not.

MTC contends that this court should allow the jury verdict to stand, but should reduce it by the amount of the liabilities MTC claimed were due from TCL. MTC also urges that if a new trial is necessary, it should be on the issue of the amount of offset items only.

This court is not a trier of fact and not the proper forum for that determination. Furthermore, on retrial TCL may be able to show that the alleged offsets are nonexistent or are substantially less than claimed by MTC. Since we have no knowledge as to how much the jury in the first trial may have considered these factors in arriving at a verdict, we hold that the same jury which decides the value of the offsets should decide the amount of the gross award.

Reversed and remanded.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.