MILWAUKEE & SUBURBAN TRANSPORT CORPORATION, Plaintiff-Respondent, v. MILWAUKEE COUNTY, Defendant-Appellant.†

*No. 77–095. Argued November 29, 1977.—Decided March 7, 1978.*
(Also reported in 263 N.W.2d 503.)

† Motion for rehearing denied, with costs, on April 21, 1978.

422

For the appellant there were briefs by *Victor M. Harding, Richard P. Buellesbach, Timothy J. McDermott, Philip J. Ward,* and *Whyte & Hirschboeck, S. C.,* all of Milwaukee, and oral argument by *Mr. Harding.*

For the respondent there was a brief by *L. C. Hammond, Gregory S. Pokrass,* and *Quarles & Brady,* all of Milwaukee; and *David M. Levy, Michael A. Rosenbloom,* and *Levy, Feldman & Licata, P. C.* of Rochester, New York, with oral argument by *Mr. Hammond.*

CONNOR T. HANSEN, J. On appeal, the county argues that the trial court erred in excluding all evidence of the unprofitable earnings record of the bus system and further argues that certain amounts of "pension under-

funding" should be deducted from the award as a matter of law. The county also raises certain evidentiary questions, and MSTC has filed a notice of review with regard to the post-judgment rate of interest.

MSTC began operations in 1952. Despite a persistent decline in the number of passengers, annual bus miles, number of employees, and number of buses, the corporation, with periodic fare increases, remained profitable until mid-1974. As early as 1972, however, the Wisconsin Public Service Commission had predicted that the trend of increasing fares would produce a continuing decline in the number of riders, and had warned MSTC that it faced failure and could not realistically be expected to survive in private ownership.

In 1974, after substantial increases in fuel and wage costs, MSTC began experiencing increasing monthly losses. These losses were slowed temporarily by fare increases to 55 cents in August, 1974, and to 60 cents—the highest fare in the nation—in December, 1974. The Chairman of the Public Service Commission urgently warned, however, that these increases were "little more than a holding action." For the calendar year 1974, the company had a net operating loss, before income taxes, of $902,398. Operating losses for the first two months of 1975 were $122,287 and $88,082, respectively, and the company projected an operating loss of $1,422,750 for the twelve month period ending March 31, 1976. After considering this and other information, the Public Service Commission, on April 11, 1975, refused to increase fares to 75 cents, observing that any further fare increase would so depress ridership as to be counterproductive to revenues. The commission chairman, concurring, stated that:

"The sickness of the mass transit system in Milwaukee is in its terminal stages. Medical treatment (other than

public subsidy or acquisition) has, so far as can be determined at this moment, run its course. The only recourse remaining is to surgery."

Shortly thereafter, Milwaukee County condemned the operating assets of MSTC, with July 1, 1975, as the date of taking. There was no interruption of service. The same buses were driven on the same routes by the same employees. Prior to the date of taking, MSTC had rejected the county's jurisdictional offer of $2,912,581, and that sum had been paid over to MSTC on June 30, 1975, as a basic award of damages. See: sec. 32.05(7), Stats.

MSTC waived an appeal to a condemnation commission and appealed to the circuit court for Milwaukee county for a jury determination of just compensation for the property taken. See: sec. 32.05(11), Stats.

After an initial pretrial conference, the trial court ordered the parties to exchange appraisal reports and to file their appraisal reports and proposed jury instructions with the court. The county's appraiser estimated the fair market value of the MSTC assets at $1,500,000; the MSTC appraisal report estimated the fair market value at $20,089,481.

For purposes of this appeal, two components of these valuations are significant. First, MSTC's appraisal report assigned a value of $3,075,046 to "intangible" or "organizational and developmental" assets of the bus system; the county's appraisal report attributed no value to intangible assets, on the theory that an unprofitable business had no such assets. Second, the county's appraisal deducted some $9,454,701 for unfunded pension obligations, while MSTC's appraisal made no deduction for this item.

Both appraisals assumed that the assets would continue to be used as an operating transit system. Both appraisals employed the "reproduction cost new, less de-

preciation" method of valuation;[1] that is, they estimated the cost of duplicating the various assets of the system as of the date of taking, and adjusted this cost to reflect depreciation.

At a second pretrial conference, the trial court discussed the parties' proposed jury instructions and certain related evidentiary questions. After discussing a number of these concerns, the parties entered into two stipulations which are at the center of the present appeal.

First, the parties stipulated, at the request of the trial court, that they would not offer any capitalization of earnings evidence. The county's lawyer stated that by this he meant "capitalizations [sic] of earnings approach and income approach," and the trial court agreed with this understanding. Because MSTC was realizing no net income in the period preceding the taking, the capitalization of earnings approach would have indicated that the entire bus system had no value whatever, and neither party's appraisal report had considered the capitalization approach as realistic or appropriate.

Secondly, and again at the trial court's request, the parties stipulated that the highest and best use of the property taken was as a transport system or an operating transport system. This stipulation was in accordance with the assumptions of both of the appraisal reports; the parties agreed that the property should not be appraised on the basis of scrap or liquidation value. Counsel for the county further conceded that the system was ". . . in effect a going concern" and that it was operating on the date of taking.

In a pretrial order, the trial court affirmed the stipulations of the parties as follows:

---

[1] The county's appraiser also considered (1) the book value of the assets and liabilities, and (2) a figure derived from the sale price of the shares of MSTC common stock. However, his report relied primarily on the reproduction cost, less depreciation method.

"14. Neither party will offer capitalization of earnings testimony, pursuant to stipulation, and therefore, the court intends to offer no jury instruction with reference thereto.

"15. The highest and best use of the property taken is as a transport system or an operating transport system, pursuant to stipulation between the parties."

Trial commenced April 5, 1977, and closed May 6, 1977. In cross-examination of MSTC's appraiser, counsel for the county asked the witness about the decline in bus ridership as a result of rising fares in the period from 1973 to the date of taking. Counsel for MSTC objected, and urged that testimony about the financial condition of the company was immaterial in view of the pretrial stipulation that the highest and best use of the assets was as an operating transit system. The trial court sustained this objection, and this ruling of the trial court is crucial to this appeal.

By stipulating that the highest and best use of the assets was as an operating system, the trial court stated, the county had implicitly agreed that the business was successful and profitable. The county protested that the stipulation had not mentioned profitability. The county maintained that continued operation and usefulness of the assets as a transit system did not mean that the business was financially successful, as demonstrated by the fact that the system continues to be operated despite its economic failure. However, the trial court expressed the view that the only possible purpose of evidence of unprofitability would be to show that the assets were not being used in their highest and best use, contrary to the pretrial stipulation of the parties. The county answered that it was not advocating a liquidation approach, but that evidence of the business' economic failure was crucial to valuation of its intangible assets. The trial court did not agree. The trial court also supported its position by

stating that consideration of earnings evidence would constitute use of the capitalization of earnings method, contrary to the pretrial stipulations.

Consistent with these rulings, throughout the trial the trial court excluded all evidence of the unprofitability of the bus system. Although evidence of trends in fares, ridership and equipment were admitted as bearing on the quality of services provided by MSTC, evidence of rising wage levels was excluded as too closely related to profitability.

The evidence of profitability excluded by the trial court included the profit and loss experience of the corporation, the decisions and orders of the Public Service Commission in connection with MSTC fare increases, and MSTC corporate records, including a resolution adopting a plan of liquidation shortly before the assets were condemned. The county maintains that exclusion of this evidence prejudiced its case with regard to valuation of intangible assets and pension underfunding, areas where the parties' appraisal reports disagreed by $3,075,046, and $9,454.701, respectively.

At the close of trial, the trial court specifically instructed the jury not to consider the profitability of the bus system, on the ground that evidence of profitability would be relevant only to show that the property could be put to a more advantageous use, in contradiction of the stipulation that the property was already employed in its highest and best use.

The trial court then submitted a five-question special verdict to the jury. The jury returned answers finding that the fair market value of the MSTC operational transportation system was $15,500,000, that this figure included the sum of $2,850,000 for the intangible assets of the system, and that no deduction had been made for pension underfunding. The trial court also permitted counsel for the county to ask whether the jury had de-

ducted $1,448,883 for accrued vacation pay, a deduction which MSTC had conceded was proper. The jury indicated that this deduction had been made.

The trial court denied the county's postverdict motion for a new trial on the basis of allegedly erroneous evidentiary rulings. On the motion of MSTC for judgment on the verdict, the trial court granted an order for judgment in the sum of $12,587,419,[2] plus interest at the rate of five percent annually from July 14, 1975,[3] to the date of entry of judgment, but withheld a decision on the post-judgment rate of interest.

Judgment was entered on June 13, 1977, in a total amount of $13,794,919.28, including interest of $1,205,-287.15 for the period from fourteen days after the date of taking, namely, July 14, 1975, to June 13, 1977, at five percent, and taxable costs of $2,213.13. In an amended judgment dated July 8, 1977, the trial court ordered payment of post-judgment interest at the rate of five percent on the total amount of the June 13, 1977, judgment. MSTC has filed a notice to review the trial court's decision with regard to post-judgment interest, and argues that interest should accrue on the entire amount of the judgment, including prejudgment interest, at the rate of seven percent annually. The county also argues that the trial court erred in calculating post-judgment interest. The county concedes that interest at seven percent should be paid on the taxed costs, but contends that the appropriate post-judgment rate of interest is five percent, and that interest should not be calculated on the $1,205,287.15 of interest included in the judgment. In other words, the county would allow interest at the rate of five percent

---

[2] This figure is the difference between the jury verdict of $15,-500,000 and the basic award of $2,912,581 previously paid to MSTC by the county.

[3] Interest accrues from the date fourteen days after the date of taking. Sec. 32.05(11), Stats.

annually on the $12,587,419 award from July 14, 1975, to the date the judgment is paid.

Additional facts appear in discussion of the issues, which are:

1. Has the county, by failing to request relief from its stipulations or to move for a mistrial, waived the right to challenge the exclusion of earnings evidence?

2. Was evidence of profitability properly excluded because the parties had stipulated (a) that the highest and best use of the assets was as an operating transit system, and (b) that no evidence of value based on capitalization of earnings would be offered?

3. Should unfunded pension obligations be offset, as a matter of law, against the value of the assets as determined by the jury?

4. Did the trial court err in admitting evidence of the estimated acquisition costs stated in the county's application for federal funds?

5. Did the trial court err in refusing to instruct the jury as to the effect of the Employee Retirement Income Security Act on the unfunded pension obligations?

6. Did the trial court err in refusing to allow use of an overhead projector in the jury room?

7. Did the trial court err in submitting a multiple-question verdict to the jury?

8. Should this court direct entry of judgment, under sec. 251.09, Stats.?

9. Did the trial court err in calculation of post-judgment interest?

MSTC argues that the county is barred from challenging the trial court's rulings because it failed to seek modification of the pretrial stipulations or move for a mistrial. All during the trial and on appeal, the county has consistently maintained that it does not seek to alter or evade the stipulations, but rather that they were misconstrued

by the trial court. Therefore the failure of the county to seek modification of the pretrial stipulations does not constitute a waiver of the right of the county to challenge the trial court's construction of the stipulations.

The county also failed to move for a mistrial. This court has said that counsel cannot simply interpose an objection, then remain silent and be heard to complain only after an adverse verdict is returned; failure to move for a mistrial will result in a waiver of the right to assert prejudice later. *Leibl v. St. Mary's Hospital of Milwaukee,* 57 Wis.2d 227, 231, 203 N.W.2d 715 (1973). By continuing with trial and taking its chances on the outcome rather than moving for mistrial, a party will waive the right to raise the assigned errors on appeal. *Valiga v. National Food Co.,* 58 Wis.2d 232, 248, 206 N.W.2d 377 (1973).

In the instant case, Milwaukee county made repeated and timely objections, explained the basis for its objections in detail, made extensive offers of proof outside the presence of the jury, and moved for a new trial after the verdict was returned. Furthermore, the alleged error is not that improper matters were brought before the jury, but that important evidence was improperly withheld from the jury. Therefore, considering the totality of the circumstances, including the effort of counsel for the county to have the evidence admitted and the importance of the alleged error, in the exercise of our discretion we opt to consider the merits of the alleged error. *Leibl v. St. Mary's Hospital of Milwaukee, supra,* 230; *Valiga v. National Food Co., supra,* 248.

The valuation of a financially troubled mass transit public utility in a condemnation take-over by a govern-

mental unit presents an extremely troublesome, difficult and unique problem.

On the one hand is a franchised monopoly-type public utility. On the other hand is a governmental unit which seeks ownership of the utility by condemnation, to provide and maintain a service which, in the exercise of its political and legislative wisdom, it has determined is either necessary or desirable for its constituents.

Such a situation presents a valuation problem not easily resolved, as evidenced by the decisions of courts in other jurisdictions which have considered the issue.[4]

It has been said that:

". . . The standard of compensation in utility condemnations is an extremely vague one, and although many tests are considered, none seems to be controlling. No rigid measures can be prescribed for the determination of 'just compensation' under all circumstances and in all cases. No hard and fast rule can be laid down that will cover every case or fix in advance the limit of the matters which may be taken into consideration by the commissioners in any particular case. Various tests have been applied, alone and in combination. The usual method of fixing the value of property for taking is by ascertaining market value. But there is hardly a market, in the usual sense, for a public utility, particularly a regulated utility. Resort must therefore be made to other tests of value, and what is used is largely a matter of judgment and circumstance. Onondaga County Water

[4] *Port Authority Trans-Hudson Corp. v. Hudson Rapid Tubes Corp.*, 20 N.Y.2d 457, 285 N.Y. Supp.2d 24, 231 N.E.2d 734 (1967), *cert. denied* 390 U.S. 1002 (1968); *In re Fifth Avenue Coach Lines, Inc.*, 18 N.Y.2d 212, 219 N.E.2d 410, 273 N.Y.S.2d 52 (1966), *modified* 18 N.Y.2d 741, 221 N.E.2d 174, 274 N.Y.S.2d 349 (1966), *appeal dismissed* 386 U.S. 778 (1967); *Re Aldercroft Heights County Water Dist.*, 60 PUR 3d 227 (1965); *Twin City Met. Pub. Transit Area v. Twin City Lines*, 301 Minn. 386, 224 N.W.2d 121 (1974); *In the Matter of the Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, Misc. No. 76-1, slip op. at 107 (Spec. Fed. Ct., October 12, 1977), — Fed. Supp. — (1977).

Authority v. New York Water Service Corp. (1955) 285 App. Div. 655, 139 N.Y.S.2d 755. . . ." Annot., *Compensation or damages for condemning a public utility plant,* 68 A.L.R.2d 398, sec. 3 (1959).

In the case at bar, the trial court construed the stipulations of the parties as to the highest and best use and capitalization of earnings approach as implying the business was profitable. The trial court therefore ruled throughout the trial that consideration of evidence of unprofitability was improper.

The county maintains that exclusion of evidence of unprofitability prejudiced its case with regard to both intangible assets and pension underfunding.

In valuing intangible assets, MSTC's appraiser gave no consideration to profitability. Rather, he identified specific types of intangibles (business record systems, personnel training, bus routes and organizational expenses) and calculated the cost of reproducing these items as of the date of taking, and adjusted for depreciation.

This approach was improper, the county argues. The county maintains that any intangible value inherent in a business enterprise is fundamentally related to the ability of that business to earn a profit, and that a losing venture has no intangible value beyond the value of its physical assets. Before any value can be attributed to intangible assets, therefore, the profitability of the business must be considered. The county insists this consideration does not involve the capitalization of earnings, nor does it imply that the assets are not in their highest and best use.

Because MSTC was a losing operation, the county's appraiser determined that it had no intangible value. Accordingly, he attributed no value to intangible assets. The county argues that it was prejudiced by its inability to show that MSTC was unprofitable, and that this inability prevented the jury from making an accurate or

informed decision as to the value of the intangible assets, which the jury determined to be worth $2,850,000.

The county argues that it was further prejudiced by the seeming contradiction between two statements by its appraiser. At the time of the taking he found the intangible assets were without value, while in an earlier report, prepared by the same appraiser, the intangible assets were valued at $2,750,360. The county maintains that the earlier report was prepared before the business became unprofitable in 1974, and that the value of intangibles disappeared when it became clear that the business could not continue to earn a profit. Because it was unable to explain the reason for this apparent contradiction in its appraisals, the county claims its case was prejudiced.

The county further argues that exclusion of earnings evidence was prejudicial with regard to pension underfunding, the largest single point of disagreement between the appraisal reports. The county introduced an actuarial report showing that the present value of the accrued and vested pension benefits of MSTC employees exceeded the market value of the pension trust fund on the date of taking by $9,454,701. The fund was thus "underfunded" by this amount, and this point was not disputed.

This underfunding did not mean that MSTC had not made contributions to the fund as required by the contract. It had, and more money was going into the fund than was being paid out. For the fund to meet the pension benefits which had been earned prior to the taking, however, and for the unfunded pension obligations of $9,454,701 to be amortized, it would be necessary for contributions to continue to be made into the fund at present rates,[5] for approximately the same number of employees, through the year 2012. *If* these payments were made, the fund would be actuarially sound. The parties' experts

---

[5] Contributions are made at the rate of 41½ cents for each employee/hour worked, with two-thirds of this amount paid by the employer and one-third by the employee.

disagreed whether this underfunding should be considered a liability of MSTC.

The county argues that any purchaser of the MSTC assets would be compelled to assume these pension obligations.[6] For this reason, the county argues, the purchaser would insist on offsetting the pension underfunding against the value of the MSTC assets in negotiating a purchase price. In these negotiations, the purchaser would be vitally interested in knowing whether the assets would generate a return sufficient to provide the necessary contributions to the fund over the succeeding thirty-seven years. If the operating returns of the transit system were inadequate to meet these expenses, or if the number of active employees should be substantially reduced, or if the plan was terminated before the year 2012, the purchaser would be forced to pay the remaining pension obligations from other sources. For this reason, the purchaser would be deeply concerned with the economic health of the business in determining whether the pension underfunding should be offset against the business' assets. The county therefore argues that it was extremely prejudicial to exclude all evidence that the system was economically unviable.

The consistent rulings of the trial court in regard to the highest and best use and capitalization of earnings are in accord with the general (although not invariable) rule that courts will not consider evidence of business income in determining the value of condemned real estate in the usual situation. 1 Orgel, Valuation Under Eminent

---

[6] This obligation would arise, in the case of purchase by a municipal corporation, from the provisions of sec. 59.969, Stats. In the case of a private purchaser, the county argues it would arise from the requirements of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. secs. 1001–1381 (1974), and from the practical necessity of good labor relations. In fact, the county has continued the pension plan and is making contributions at the former contractual rate.

Domain (2d ed. 1953) (hereafter Orgel), sec. 162, pp. 655–662; 4 Nichols, Eminent Domain (3d ed.) (hereafter Nichols), sec. 12.3121[1], p. 12–154.1.

However, a different rule prevails in cases dealing with the condemnation of public utilities. There, evidence of profits is properly considered. 1 Orgel, *supra,* sec. 174, p. 695; 5 Nichols, Eminent Domain (3d ed.), sec. 19.31, pp. 19–68; 27 Am. Jur.2d Eminent Domain, sec. 339, pp. 169–173. Thus in *Oshkosh W. W. Co. v. Railroad Commission,* 161 Wis. 122, 127, 152 N.W. 859 (1915), this court said that the main elements to be considered in the valuation of a public utility for condemnation included:

". . . the present value of its physical property; *the present and prospective reasonable earnings of its business;* the going value thereof; and the amount of money presently needed to put the plant in good condition. . . ." (Emphasis added.)

This approach reflects the fact that in franchised utility condemnations, unlike ordinary condemnations of real property, the taking of the property necessarily destroys the existence of a private business enterprise, and the company is not able to re-establish its business elsewhere. 1 Orgel, *supra,* sec. 200, pp. 58, 59; *Kimball Laundry Co. v. United States,* 338 U.S. 1, 12, 69 Sup. Ct. 1434, 93 L. Ed. 1765 (1949); Annot., *Compensation or damages for condemning a public utility plant, supra.* The profits of the business are therefore directly relevant.

In the absence of the pretrial stipulations, therefore, evidence of profitability would have been relevant and admissible. The question here is whether admission of such evidence was precluded by the stipulations.

The trial court considered that by stipulating that the highest and best use of the property was as an operating transport system, the county implicitly stipulated that

the system was profitable. If such an application or interpretation of the stipulation is correct, the jury will never be fully apprised, in a realistic manner, of the true nature of the utility the governmental unit is condemning.

Condemned property is ordinarily valued by reference to a hypothetical sale to a willing private buyer in the private market. In such a transaction, it might well be inferred that the utility property would not continue to be used as an operating system, and that such use would not constitute the highest and best use of the property, unless the use would be profitable to the private buyer. However, this private market approach is of only limited usefulness in the present case. Courts have regularly departed from the market approach when valuing condemned utility property, consistent with the observation that ". . . when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards." *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 Sup. Ct. 547, 94 L. Ed. 707 (1950).

Departure from the market approach has specifically been approved in cases involving unprofitable transportation systems. *Port Authority Trans-Hudson Corp. v. Hudson Rapid Tubes Corp.*, *supra; In the Matter of the Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973, supra.* In such cases the market approach is often inadequate; an unprofitable transport system which would not continue to be operated in private hands may have value for continued operation by the government. As a result of the property's special adaptability for public use, a political decision may be made to operate the property in unprofitable uses. In such situations, the highest and best use of the property is not necessarily a profitable use. For this reason, the pretrial stipulation in the instant

case should not have been considered as a concession that the business was profitable, particularly when the trial court and the parties knew that it was not such an operation.

Nor would the pretrial stipulation that the capitalization of earnings method would not be used preclude use of earnings evidence for other purposes. On the contrary, in 2 Orgel, *supra,* sec. 216, p 127, it is stated:

> ". . . The tribunals have uniformly rejected capitalization of earnings as a measure of going-concern value . . . But *evidence of earnings is freely admitted* and the fact that courts and commissions regard going-concern value as an additional allowance for the assured lucrativeness of the enterprise indicates that *earnings will be considered to determine whether the business is profitable and therefore entitled to any award over and above the value of the physical property."* (Emphasis added.)

Similarly, Jahr, Eminent Domain, Valuation and Procedure (1953), sec. 172, p. 282, states:

> ". . . [H]ow is this going concern value [of a public utility] determined? *It is hardly based on capitalization of net earnings.* Such a method of valuation assumes too many contingencies. *Consideration is given to evidence of earnings and to profitableness of the business.* But these earnings must be actual earnings. Evidence of prospective earnings are sometimes received, but more frequently rejected as speculative. The courts do not indicate the method used in reaching this intangible item of going concern value. There probably is none. . . ." (Emphasis added.)

Evidence of earnings may be considered although the property is valued by the reproduction cost, rather than capitalization of earnings, method. 4 Nichols, *supra,* at sec. 12.32[3][b], p. 12–378.8.[7]

---

[7] *See also:* Note, *Valuation of Conrail Under the Fifth Amendment,* 90 Harv. L. Rev. 596, 610, 611, at *fn.* 65 (1977) and cases cited.

From a review of these authorities we are satisfied that neither the pretrial stipulation as to highest and best use nor the stipulation prohibiting capitalization of earnings forecloses the introduction of evidence of earnings.

Most condemnations of unprofitable utilities involve factual situations which are entirely consistent with the stipulations in the instant case. That is, the property is taken for continued use as a utility; there is no suggestion that the property has some higher or better use (*e.g.*, liquidation) ; and the capitalization of earnings approach is rejected because the utility has no earnings.

A review of the cases reflects that the business' earnings record is invariably considered and treated as highly significant. *See:* Cases collected in 2 Orgel, *supra*, sec. 216, pp. 120–141, and Annot., *Compensation or damages for condemning a public utility plant, supra*, 392, secs. 25, 33, pp. 410, 413, 414. *See generally:* Note, *Going Concern Value in Condemnation of Unprofitable Public Utilities*, 52 Cornell L.Q. 752 (1967) ; Note, *Going-Concern Value of a Public Utility in Condemnation by a Municipality*, 6 Ariz. L. Rev. 92 (1964). Indeed, we have been unable to find any utility condemnation case in which evidence of profitability was not considered.

Thus in *Port Authority Trans-Hudson Corp., supra*, unprofitable railway tunnels beneath the Hudson river in New York City were condemned. There was no question that the highest and best use of the property was as part of a transit system. The New York Court of Appeals said, *Port Authority Trans-Hudson Corp., supra*, at 738:

". . . We are here concerned with a property which has a usefulness created by the owner himself through the expenditure of large sums of money and by the continued operation of the property for the very purpose for which the petitioner is acquiring the property . . .

It is admittedly of great usefulness in the daily transportation of thousands of commuters. . . ."

In addition, the court squarely rejected the capitalization of earnings approach.

Nevertheless, neither continued use as a transit system nor exclusion of capitalization of earnings precluded consideration of the system's unprofitability. The court said:

". . . We cannot ignore the unprofitability of the corporation. That is a very significant factor. We cannot ignore the reasons for this unprofitability. . . ." *Port Authority Trans-Hudson Corp., supra,* p. 740.

The court held that the going concern value or intangible value of the business must be determined from the cost of developing similar operating records, schedules and procedural systems, but that:

". . . To the extent that unprofitability is evidence of inefficient organization that factor must be considered in determining the award." *Port Authority Trans-Hudson Corp., supra,* p. 740, 741.

In *Re Aldercroft Heights County Water Dist., supra,* the California Public Utilities Commission considered the value of an unprofitable water utility taken for continued public use. The capitalization of earnings method was rejected, and alternative uses for the property were not considered. Nevertheless, the commission said:

". . . Apart from the cost studies and the various opinions concerning land values, from which we must derive a judgment as to what we consider to be the market value of the properties, *we cannot overlook what the record reveals concerning the underlying physical and economic facts.*

"It is clear that the company, with few minor exceptions, has not been making earnings sufficient to meet operating expenses, including depreciation and taxes, or a return on its investment. Thus, *the utility can be considered a 'going concern,' as of October 24, 1961, only in*

*the sense that it was in actual operation, but not in the sense that it was doing a profitable business.* Hence, there is lacking a foundation in this record for consideration of 'going concern' value (other than nil) as an element in fixing just compensation, . . ." (Emphasis added.) *Re Aldercroft Heights County Water Dist., supra*, at 234, 235.

By the same reasoning, the county's pretrial concession that MSTC was a "going concern" must be recognized as an acknowledgment that the business was in actual operation, but not that it was necessarily a profitable business, which in fact, it was not.

We are of the opinion that the pretrial stipulations did not require the exclusion of earnings evidence. The primary rule in the construction of stipulations is to ascertain and give effect to the intention of the parties. *D'Angelo v. Cornell Paperboard Products Co.*, 33 Wis.2d 218, 227, 147 N.W.2d 321 (1967). Stipulations should be construed consistent with the apparent intention of the parties, the spirit of justice, and the furtherance of fair trials upon the merits, and should not be construed technically so as to defeat the purposes for which they were made. *Swiger v. Eden*, 238 Iowa 44, 24 N.W.2d 793 (1946), 73 Am. Jur.2d, *Stipulations*, sec. 7, p. 541. In seeking the intent of the parties, the language of the stipulation should not be construed so as to effect the waiver of a right not plainly intended to be relinquished. 73 Am. Jur.2d, *Stipulations*, sec. 7, p. 542. For these reasons, we conclude that the trial court erred in excluding the earnings evidence.

On appeal, the county argues that this error can be remedied by deducting from the judgment the amount attributed to intangible assets by the jury—$2,850,000. The county argues that as a matter of law there can be no intangible assets or going concern value in an un-

profitable utility. This proposition is not without support in the authorities. It has been said that:

"If the business were wholly unprofitable and beyond the possibility of earning, the plant would be worth scrap value only. The tribunals recognize this fact, for they state that in such a case the property either has no going-concern value or that its going-concern value is 'negative.' . . .

" . . .

" . . . The cases . . . state that going-concern value should be allowed if the utility is profitable or if there is a reasonable probability of its becoming so. . . ." 2 Orgel, *supra,* sec. 216, pp. 125, 126.

*Accord:* Jahr, *supra,* sec. 172, p. 284 ("Where, however, a utility is unprofitable, going concern value is not allowed.") ; *United States v. Boston, C. C. & N. Y. Canal Co.,* 271 Fed. 877, 897 (1st Cir. 1921). *See: Roberts v. New York,* 295 U.S. 264, 282, 55 Sup. Ct. 689, 79 L. Ed. 1429 (1935) (". . . Substantial prices are not paid for the privilege of conducting a business at a loss. . . .") ; *Cf. Re City of Chippewa Falls,* 1927A PUR 545, 558 (1926) (Wis. Pub. Service Comm.) (". . . there is a real going value . . . where the earnings are sufficient to pay a reasonable return. . . .").

Other authorities have rejected this view, and have held that evidence of unprofitability, although relevant to the process of valuation, does not automatically foreclose the existence of intangible values. *Kimball Laundry Co. v. United States, supra; Port Authority Trans-Hudson Corp., supra,* at 740 ; *In re Fifth Avenue Coach Lines, Inc., supra.*

We believe that, in the case before us, evidence of profitability or unprofitability should be considered and that evidence of the existence of some intangible value should not, as a matter of law, be excluded. The condemnor of a failing utility may acquire assets which

would be valueless in the private market but which are useful in continued operation of the utility by government.

Thus, as in the *Port Authority Trans-Hudson Corp. Case, supra,* and the *Fifth Avenue Coach Lines Case, supra,* the trier of fact should be permitted to consider the fact that the condemnor has acquired useful business record systems, routes and schedules, and trained personnel. The trier of fact should consider the earnings record of the business, as evidence of the effectiveness and value of these intangible assets. The reproduction approach may also properly be considered in valuing these assets, as was done in this case, although reproduction cost would ordinarily mark the upper limit of their value, since it is the price at which they could be reconstructed. *See:* 2 Orgel, *supra,* sec. 188, pp. 3, 4; *Re City of Oroville,* 1922E PUR, 451, 467 (1922) (Cal. R. R. Comm.)

We would further observe that before trial and at trial, the county took the position that it was for the jury to determine the extent, if any, to which pension obligations affect the fair market value of the property. We believe this is a correct application of the law. However, on appeal, the county maintains that the full amount of the unfunded pension obligations should be deducted from the judgment as a matter of law. We reject such a suggestion. As the trial court pointed out, the weight the pension costs should have in valuing the totality of assets and liabilities of a going concern is not capable of exact determination by any mathematical or legal formula. Likewise, this court cannot say as a matter of law what weight this factor should have.

Therefore, it is our conclusion that the exclusion of earnings evidence by the trial court cannot be remedied

by simply deducting the jury's intangible value figure from the judgment. In addition, on appeal it is impossible to calculate the effect of the exclusion on the jury's determination with regard to pension underfunding. A buyer who knew that the bus system was apparently incapable of meeting its expenses, and that it might therefore be unable to meet the required pension obligations over the next thirty-seven years, would be more likely to insist upon offsetting at least some portion of the pension costs against the price of the assets than would a buyer who believed the assets to be profitable. The trial court's evidentiary ruling therefore had a prejudicial but incalculable effect on the county's case. The parties' valuations on the two points of intangible assets and pension underfunding differed by the substantial sum of $12,529,747. Therefore we believe the judgment must be reversed and the cause remanded for a new trial.

In applying for federal funding for the operation of the Milwaukee bus system in 1975, the county prepared a grant application in which the county estimated the cost of "[a]cquisition of the physical assets of the Milwaukee & Suburban Transport Corporation" at $11,685,728. At trial, counsel for MSTC was permitted to examine witnesses about this estimate. The county argues that admission of this evidence was improper. The county argues that the $11,685,728, figure referred to the value of the physical assets alone, and did not reflect deductions for pension underfunding and accrued vacation pay, which, the county argues, would have to be deducted to arrive at "overall fair market value." Thus, says the county, the application figure represented the county's "maximum exposure," depending on the jury's ultimate award.

However, this objection goes not to the admissibility of the evidence, but to its weight. As the county itself

points out, any evidence which bears on the fair market value of condemned property is generally considered competent. *Herro v. Dept. of Natural Resources,* 67 Wis.2d 407, 420, 227 N.W.2d 456 (1975). The trial court properly admitted this evidence as an admission tending to impeach the county's position at trial. The county was not prohibited from presenting its explanation for the figure.

The county further argues that the evidence was prejudicial because it tended to reveal the federal source of the funding, and thus encouraged a liberal award. Although evidence of the source of funds to pay condemnation awards is generally considered improper, such evidence will be deemed harmless in the absence of a showing of prejudice to one of the parties. *See:* Annot., *Propriety and Effect, in Eminent Domain Proceeding, of Argument or Evidence as to Source of Funds to Pay for Property,* 19 A.L.R.3d 694, 696, sec. 2 (1968). There is no indication that the evidence admitted in the instant case was prejudicial.

On the contrary, the trial court carefully limited the use of the evidence to avoid any prejudicial effect. The lawyers were instructed not to refer to the county's application as an application for funds, but simply as a "project application," nor was reference allowed to the fact that funding was later approved. Both the lawyers and the witness who had prepared the application were instructed to avoid any reference to "funding."

Finally, the trial court specifically instructed the jury not to consider the source of the funds which would ultimately pay the amount of the award. It is generally held that such an instruction is itself sufficient to cure any prejudicial effect of improper evidence as to the source of funds. *See:* Annot., *Compensation or damages for condemning a public utility plant,* 68 A.L.R.2d 704, 705,

sec. 6[a] (1959). It cannot be said, therefore, that there is any substantial likelihood that admission of the estimated acquisition cost had any prejudicial effect.

The county next argues that the trial court erred in failing to instruct the jury as to the effect of the Employee Retirement Income Security Act (ERISA) with regard to the pension obligations. It is conceded, however, that this Act would have application only in the event that the pension plan were terminated. The parties have stipulated that the assets were taken for continued use. The pension plan has been maintained in effect by the county. Indeed, the county is required by statute to preserve the existing pension benefits of employees under the plan. Sec. 59.969(2)(b), Stats. It is also significant that political subdivisions, including Milwaukee County, are not subject to coverage under ERISA. 29 U.S.C., sec. 1321(b)(2) (1974).

Under these circumstances, it was not error for the trial court to fail to instruct the jury with regard to ERISA. The trial court could reasonably have determined that any effect of the Act on the value of the assets was remote and speculative, and would be outweighed by the tendency of the instruction to confuse or distract the jury in an already complex case. It was not error, therefore, to deny the requested instruction.

When the jury retired, the trial court declined to provide them with an overhead projector and screen which had been used by counsel for the county to project visual exhibits throughout the trial. Instead the jury was provided with the county's exhibits in the form of transparencies and reproductions on standard sized paper. The county argues that this was error because MSTC exhibits were submitted to the jury in the form of large charts used at trial.

Whether particular exhibits are to be admitted to the jury room is a matter within the sound discretion of the trial court, *Valiga v. National Food Co., supra,* at 249, and the trial court has broad discretion in making this determination. *Schnepf v. Rosenthal,* 53 Wis.2d 268, 272, 193 N.W.2d 32 (1972).

The county's objection does not concern the contents of the exhibits, but merely their size. It is argued that the jury would be unduly swayed by the dimensions of the various exhibits. The deliberations of the jury are entitled to higher regard than this. In a trial as complex and lengthy as this one, and in which the record is so extensive, the task of the jury is serious and difficult. That the jury understood its responsibility is evidenced by the fact that the jury deliberated for three days before returning its verdict. There is no indication that these deliberations were unduly influenced by the physical size of the exhibits. In this setting it was not an abuse of discretion for the trial court to decline to provide the jury with an overhead projector to view the exhibits of the county.

The county next contends that the trial court erred in submitting a five-question special verdict to the jury. The county argues that the "unit rule of damages" requires that the verdict be limited to a single question, which would ask the jury the fair market value of the property on the date of taking.[8]

Under the "unit rule of damages," improved real estate is required to be valued as a single entity. Buildings and improvements are not valued in isolation from the market value of the land, but are considered only to the extent that they enhance the value of the land. The proper

---

[8] As the county points out, sec. 32.09(5)(a), Stats., requires a condemnor to pay, in the case of a total taking, "the fair market value of the property taken. . . ."

measure of damages is therefore the market value of the land with the improvements on it. 4 Nichols, *supra,* secs. 13.11, 13.11[2], pp. 13–8, 13–13 to 13–18. Similarly, this court has said that in the valuation of a public utility for purposes of condemnation:

". . . The value of the plant and business is an indivisible gross amount. It is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all not as separate things, but as inseparable parts of one harmonious entity, and exercising the judgment as to the value of that entity. . . ." *Appleton Water Works Co. v. Railroad Commission,* 154 Wis. 121, 148, 142 N.W. 476 (1913).

From this principle the county argues that it is reversible error to submit a multiple-question verdict in a condemnation case. The county cites the rule that in the case of a partial taking the jury should be given a two-question special verdict asking (1) the before-taking value of the entire parcel, and (2) the after-taking value of the remainder. *Besnah v. Fond du Lac,* 35 Wis.2d 755, 759, 151 N.W.2d 725 (1967) ; *see:* Wis J I—Civil, Part II, 8100. This approach, however, is derived from the explicit requirements of sec. 32.09(6), Stats., applicable to partial takings, and does not represent a general principle applicable to the instant case.

The requirement that property be valued as an integrated and comprehensive entity does not mean that the individual components of value may not be examined or considered in arriving at an overall fair market value. Indeed, the widely accepted reproduction cost method of valuation, used by both parties here, determines value from the cost of reproducing the various components which make up the property. This approach does not contradict the "unit rule" because the components are valued, not in isolation, but as interacting parts of a larger whole,

in this case an operating transit system. In *United States v. City of New York* (2d Cir. 1948), 165 Fed.2d 526, 528, 529, it was said that despite the unit rule:

". . . it certainly does not follow, because 'site' and improvements have been inextricably welded that it is never possible to come at their joint value by attributing one factor to 'site' and another to improvements. . . ."

The unit rule requires only that the various components be valued as contributing parts of an organic whole.

The form of the verdict in the instant case satisfied this requirement. The trial court correctly instructed the jury:

"The property in question is but a single unit. While it is composed of all of the elements about which the witnesses have testified during the course of this trial, it must be valued as a single unit. It is your duty to take into consideration all of the elements and factors that enter into the question of its fair market value, all that contributes to make the property valuable as well as all elements and factors that detract from its fair market value. Finally, weighing all the elements and all of the factors as they may appear from the evidence, you are to determine what is the fair market value for the property in question as a composite unit."

The structure of the verdict itself was also consistent with a unitary approach. The first question asked the fair market value of the property taken. The remaining questions merely asked what calculations had gone into the jury's determination of overall value; they did not require the jury to value individual components in isolation from the remainder of the system.

In Wisconsin, the special verdict is the rule and not the exception. Judicial Council Committee's Note to sec. 805.12 (1), Stats., Wisconsin Rules of Civil Procedure, 67 Wis.2d 703. In the instant case, the special verdict aided

the task of the trial court and this court by demonstrating that an award was made for intangible assets and that no offset was made for pension costs. It also made it possible to determine whether the jury's treatment of these factors was within the reasonable range of possible market values. The use of the particular special verdict in this case was therefore not improper.

The county also argues that this court should direct entry of a modified judgment, under sec. 251.09, Stats. We decline to do this. The county argues that the sum of $2,850,000, which the jury attributed to intangible assets, should be deducted from the judgment as a matter of law, on the theory that an unprofitable system can have no intangible assets. However, we have heretofore determined that under the facts of this case, the valuation of the intangible assets is a factual determination.

Similarly, the amount of the pension underfunding cannot be deducted from the judgment as a matter of law. As we have previously stated, there was conflicting evidence on the question of whether this underfunding represented a liability to MSTC. What deduction, if any, would be appropriate in this particular case for the alleged pension underfunding is a factual determination.

Finally, both the county and MSTC challenge the trial court's calculation of post-judgment interest. Sec. 32.05 (11) (b), Stats., 1973, provided:

"(b) If the jury verdict as approved by the court exceeds the basic award, the appellant shall have judgment for the amount of such excess plus *legal interest thereon to date of payment in full* from that date which is 14 days after the date of taking, plus his statutory taxable costs and disbursements pursuant to Section 271.02(2)." (Emphasis added.)

In *Weiland v. Department of Transportation,* 62 Wis.2d 456, 215 N.W.2d 455 (1974), this court held that this section requires the payment of post-judgment interest

at the legal rate of five percent, as provided by sec. 138.-04, Stats.

Accordingly the trial court awarded post-judgment interest at the rate of five percent on the full amount of the judgment, which included prejudgment interest at the rate of five percent from fourteen days after the date of taking to the entry of judgment. In this case this prejudgment interest amounted to $1,205,287.15.

MSTC has filed a notice to review this decision, and argues that this court's decision in the *Weiland Case,* *supra,* should be reconsidered. The "legal interest" required by sec. 32.05(11)(b), Stats., is not the five percent rate of sec. 138.04, but rather the seven percent rate of sec. 815.05(8), the general post-judgment interest statute, MSTC argues. This argument was considered and rejected in *Weiland, supra,* and the arguments now advanced do not persuade us to reverse that decision.

MSTC also contends that it is a violation of constitutional guarantees of equal protection to provide a lesser rate of interest in condemnation than in other matters. The difference in interest rates is not of constitutional dimensions. Furthermore, the legislature has authorized the condemnee to recover prejudgment interest, which would not ordinarily be available on an unliquidated claim.

It is the county's position that the trial court was correct in applying a five percent rate of interest, but that this rate was applied to the wrong sum. The trial judge calculated interest at five percent from fourteen days after the date of taking to the date of entry of judgment, and included this amount in the judgment. He then awarded post-judgment interest at five percent on the full amount of the judgment, thus awarding interest on the interest, or compounding the interest as of the date of judgment.

MSTC maintains that a judgment bears post-judgment interest on the entire amount thereof, including any separate award of interest, and that this principle is applicable to condemnation judgments. This proposition has been accepted by several courts. *Louisville & Nashville R. R. Co. v. Sloss-Sheffield S. & I. Co.,* 269 U.S. 217, 46 Sup. Ct. 73, 70 L. Ed. 242 (1925). *Atlantic Refining Co. v. Director of Pub. Works,* 104 R.I. 436, 244 Atl.2d 853 (1968); *see:* 3 Nichols, *supra,* sec. 8.63[5], p. 195; 47 C.J.S., *Interest,* sec. 21, p. 34.

Here, however, sec. 32.05(11)(b), Stats., specifically provides for ". . . legal interest . . . to date of payment in full from that date which is 14 days after the date of taking. . . ." In our opinion, this requires the payment of continuous, simple interest at five percent from fourteen days after the date of taking until the date of payment, rather than interest compounded as of the date of judgment. This interest is to be calculated on the excess of the fair market value of the property, as determined by the jury or the circuit court, over the basic award. This interpretation of the statutes precludes the payment of interest on interest and is in accord with *Weiland, supra,* at 462, where this court said the condemnor was required to pay interest at five percent:

". . . from fourteen days after date of taking until the date of payment in full."

The trial court was in error in its computation of interest and, on remand, interest is to be calculated consistent with this opinion.

This court is not a trier of fact. We have held that the trial court erred in excluding evidence of the profitability of MSTC. We have also held that valuation of the intangible assets and possible underfunding of the pension program are factual determinations. There is no

way either this court or the trial court could determine how much of a factor the exclusion of this evidence was in the verdict arrived at by the jury. We come to the conclusion that the same jury which considers the evidence of the profitability of MSTC in valuation of the intangible assets and pension underfunding should decide the gross amount of the award. Therefore, the judgments are reversed and the cause remanded for a new trial.

*By the Court.*—Judgments reversed and cause remanded.

CALLOW, J., took no part.