[Civ. No. 21385.    First Dist., Div. Three.    May 6, 1964.]

COUNTY OF ALAMEDA, Plaintiff and Appellant, v. MEADOWLARK DAIRY CORPORATION, LTD., et al., Defendants and Respondents.

J. F. Coakley, District Attorney, and William S. Coit, Deputy District Attorney, for Plaintiff and Appellant.

James E. Cox, Tinning & DeLap and Bernard F. Cummins for Defendants and Respondents.

DEVINE, J.—The County of Alameda, acting in pursuance of a resolution of its board of supervisors, brings this action in eminent domain to acquire land owned by Meadowlark Dairy, a corporation,[1] "for fairground uses and purposes of said county." Meadowlark defends on the grounds that the land is sought for use in connection with the parimutuel racing program of the fair, and that this is not a public use, but, indeed, a deleterious use, and that the supervisors' resolution is predicated on misinformation and constructive fraud. Meadowlark raises the alternate defense that if the contemplated use be a public one, the proposed acquisition is for speculative future plans, without evidence as to the proposed time of use.

At the trial, the testimony showed that the fair management intends to use the land as a parking site for the immediate future and later as a site for fair buildings. Respondent produced evidence that parimutuel betting is an important factor in the operation of the fair. (1) Plans are under way and money is budgeted to build a new grandstand at a cost of $1.3 million, increasing the seating capacity from 4,000 to 6,500 and making for a smoother traffic flow to and from the betting windows. (2) The hours of racing were changed in order to get people out in the evenings to play the races, and 12 races a day are held as contrasted with the normal eight or nine at private tracks. (3) The annual handle of $5 million is increasing, and the expectation or hope of the management is that with a proper grandstand, wagering will exceed that at the State Fair. (4) The proceeds from parimutuel betting are the principal income of the fair. (5) The county operates a trailer park on public land, which is restricted to persons who are directly connected with the race horse program. (6) A small amount of the county income is based on the sale by a concessionaire of "Tip Sheets." (7) The county has 700 stalls for the boarding of race horses and would like to have 1,000 stalls, has 11

---

[1]The corporation is considered as the sole respondent, although there are also nominal respondents.

barns and plans to have more. (8) About one-half of the area of building under roof is given directly to the racing operation. (9) Eighty-five of the 153 acres now owned by the county for the fair are used for horse racing.

Respondent also produced testimony of a clergyman that legalized gambling is not socially good, and is in general viewed by the churches as a wasteful endeavor; and of the dean of criminology at the University of California to the effect that parimutuel betting and commercial gambling generally serve no legitimate public purpose, because the problems which the community must meet as a result far outweigh whatever returns there may be.

It was established, however, by evidence produced by appellant, that the fair has the exhibits and activities typical of county fairs: agricultural, floricultural, livestock, poultry, pigeon and rabbit exhibits; art, home arts, mineral and gems, and photographic departments; and a junior department which has a variety almost as great as that of the other departments. Prizes are awarded. There are professional and amateur vaudeville type entertainment, dance groups, band concerts, a parade, a restaurant at which food and liquor are served, puppet shows, fashion shows, outdoor aerial thrill acts, parachute jumps, a kiddies' circus, bowling contests. In the off-season there are professional wrestling matches, a roller derby, high school basketball games, and meetings of all kinds of organizations, in particular fraternal orders, which rent the facilities.

The horse racing is considered part of the entertainment, and there was horse racing at the fair in the years when betting was forbidden. Premiums are paid to California-bred horses pursuant to state law, to encourage the industry. As stated earlier, horse racing is the major enterprise in the fair's finances. More people attend the fair for other purposes, however, than that of attending the racing. The ratio is about one attendant at the racing for every 3.6 customers of the fair. The manager of the fair testified that he thought the average attendance on Sundays, when there is no racing, at the fair is better than that of every other day, except the Fourth of July.

As to the need for lands, it was testified by the manager that for the foreseeable future there is not enough land, but the witness could not say whether the present fairgrounds would be adequate if there were no horse racing. He testified

that even without racing, the parking area is not adequate on the Fourth of July, and that more space will be needed very soon on Saturdays and Sundays even though there is no racing on Sundays.

The manager testified that the fair functions as an integrated unit.

The court found that the use for which the county seeks to condemn the property does not constitute a public use. The court does not specify what use it finds the county does seek to condemn, but it would be a fair inference that the court deemed the use to be that of horse racing and parimutuel betting.

The court found that the resolution of taking is predicated upon misinformation and constructive fraud, and constitutes an abuse of discretion in that the taking is not for a public use. Here, again, the misinformation and fraud are unspecified, and the use which the court deemed to be the actual one is not described; but, again, the fair inference is that the court deemed the use to be that of horse racing and parimutuel betting.

It is conceded by respondent that the matter of necessity of the particular taking for what truly is a public use is a nonjusticiable issue. This is the holding in *People* v. *Chevalier,* 52 Cal.2d 299, 307 [340 P.2d 598]. ██ Respondent relies not on lack of public necessity within a given public use, but on lack of public use itself. This is a justiciable issue. (*People* v. *Nahabedian,* 171 Cal.App.2d 302, 307-309 [340 P.2d 1053]; *County of San Mateo* v. *Coburn,* 130 Cal. 631, 634 [63 P. 78, 621].)

Respondent also concedes that it is not for the courts, but for the lawmaking authorities of the state—the people and the Legislature, to decide whether or not horse racing and wagering on the results is to be permitted, and if so, when, where and on what conditions. But, says respondent, the legislative authorities have not given the power of condemnation to any public body in order to acquire property for horse racing and wagering.

The county replies that land may be taken under eminent domain for county fair purposes, and that although the horse racing and its attendant wagering are not specifically named as uses within the larger use of county fairs, they are included within the broader sense.

██ Respondent apparently does not question the

county's power of eminent domain, for fair purposes generally, as distinguished from wagering on horse races, but the basis should, nevertheless, be stated. It is to be noted that the power derives from section 1238, subdivision 16, of the Code of Civil Procedure, which gives the power for use of "Expositions or fairs in aid of which the granting of public moneys or other things of value has been authorized by the Constitution." The Constitution grants an exemption to counties from taxation by the Legislature for county purposes (art. XI, § 12), and to property belonging to a county (art. XIII, § 1). Exemption from taxation is a thing of value. (See *City of Ojai* v. *Chaffee*, 60 Cal.App.2d 54, 59 [140 P.2d 116].) That county fairs are recognized by the Legislature as a county function appears from the statutes which recognize and encourage the county fairs, such as: Government Code section 25901, allowing the board of supervisors to erect and maintain permanent county fair buildings; Government Code section 25904, allowing the board of supervisors to levy a special tax for county fairs; Business and Professions Code section 19627, distributing funds collected from licensed horse racing throughout the state to county fairs; and Revenue and Taxation Code section 213, exempting personal property which is brought into this state for use or exhibition at any fair. The giving to county fairs of the right to conduct horse racing and wagering thereon is of itself a thing of value, as discussed more specifically below. In *Shean* v. *Edmonds*, 89 Cal.App.2d 315 [200 P.2d 879], it was held that the constitutional provision against appropriations for the benefit of any institution not under the exclusive management and control of the state (Const., art. IV, § 22), and the constitutional provision against giving of public funds (art. IV, § 31), do not forbid payments to a nonprofit county fair association whose purposes are those of a county fair.

From all of the above, we conclude that a county has the power of eminent domain for the purposes of a county fair.

▇ Parking of vehicles is an indispensable adjunct to the conduct of a fair. The land to be taken is to be used for parking in the immediate future. There is no segregation of vehicles by ascertaining whether the occupants are going to horse racing or to other functions of the fair, and, of course, even if they were all going to the racing, it could not be known how many intended to wager. The parking will serve all of the fair's activities, none of which, except the racing, is challenged by respondent.

Even considering, however, that the land to be taken will be a substantial auxiliary to the racing while it is used for parking, and possibly will be used directly for racing purposes later, we do not deem it to be a proper judicial function to dismember the fair's functions and to evaluate the public benefit of a severed part. The serving of liquor in the fair's restaurant may be objectionable to some; the risks taken by aerialists may be offensive to others; the exhibit of modern art may be deemed useless by the admirer of the display of bovines. Variety is of the essence of a county fair. The fair must be taken as a whole. The wagering feature of the racing is not a severable one, merely because it produces the largest revenues. ■ Activities which promote recreation of the public constitute a public purpose. (*County of Los Angeles* v. *Dodge*, 51 Cal.App. 492, 500 [197 P. 403]; *City of Los Angeles* v. *Superior Court*, 51 Cal.2d 423, 434 [333 P.2d 745].)

Respondent concedes that the morality of betting on the races is not a subject for judicial consideration so far as police power allows it, the Legislature having spoken. Respondent introduces the subject of morality as a test of public use in respect of eminent domain. We have reasoned, as above explained, that the use is public because the whole enterprise of the fair is public; but we observe, too, that the policy of the state as to horse racing at licensed tracks, at the state fair, and at county and agricultural district fairs is not unfavorable to racing and wagering. An elaborate system has been established by the state. A county may not interfere with this. (*Desert Turf Club* v. *Board of Supervisors*, 141 Cal.App.2d 446 [296 P.2d 882].) ■ The state's policy in respect of wagering at established tracks, as determined by the initiative (Const., art. IV, § 25a), and by the Legislature (Bus. & Prof. Code, div. 8, ch. 4), does not militate against the concept of public use of property that is made available for racing as one of the functions of a county fair.

Respondent points out that when subdivision 16 of section 1238 of the Code of Civil Procedure, allowing condemnation for purposes of certain fairs, was adopted in 1911, wagering on all horse races was illegal, and criminal, under section 337a of the Penal Code. (*Matter of Roberts* (1910) 157 Cal. 472 [108 P. 315]; *Matter of Brown* (1909) 156 Cal. 632 [105 P. 739].) It was not until 1933 that the parimutuel system was legalized. Therefore, says respondent, the Legislature did not

intend eminent domain to have been conferred for horse race wagering activity, and it has not acted since 1933 to permit eminent domain for such activity. Here, again, the distinction is this: The power is usable, not because there is horse race wagering at the fair, but because the land is taken for the county fair.

The second contention of respondent is somewhat at variance with the first. It is, that the land is not to be used within a reasonable time for any purpose of the fair, but is to be acquired in order to forestall higher prices of the future, and, as to one segment, to avoid severance damages. Conceivably, the two defenses urged here may be put forward together logically, that is, that the ultimate use is not a public one, and that no use is contemplated within a reasonable time.

We think it is unnecessary to discuss the distinction between the quantity to be taken (a nonjusticiable issue) and the character of the use (justiciable as to bad faith and fraud) (*People* v. *Chevalier, supra,* 52 Cal.2d 299; *People* ex rel. *Dept. of Public Works* v. *Lagiss,* 223 Cal.App.2d 23 [35 Cal.Rptr. 554]), and to decide whether withholding of all of the land for an unreasonable time would be a proper defense in the case, because of the trial judge's findings. These make no reference to withholding the land, to lack of plan to use it, to severance damages and their avoidance, or to any intention of the condemner not to use the land for parking purposes. On the contrary, the finding is that "the intention of the plaintiff, and of the said Board, has been and is to devote said property to a use which is not a public use." It appears from this positive statement that the judgment was based on the contemplated use, not on contemplated nonuse. In fact, Meadowlark's brief itself says that "Respondents contended below, and the trial court so found, that appellant seeks to use its property solely for the expansion of its commercialized gambling."

Judgment reversed, with direction to proceed to trial on the issue of valuation.

Draper, P. J., and Salsman, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied July 1, 1964.