[S.F. No. 24363. June 21, 1982.]

CITY OF OAKLAND, Plaintiff and Appellant, v.
OAKLAND RAIDERS et al., Defendants and Respondents.

COUNSEL

David A. Self, John D. Rogers, Rogers, Vizzard & Tallett, Michael W. Stamp, Laurence P. Horan, Horan, Lloyd & Karachale, Richard Winnie, City Attorney, Jeffrey N. Haney, Acting City Attorney, and Theodore R. Lakey, Assistant City Attorney, for Plaintiff and Appellant.

Moses Lasky, R. Stewart Baird, Lasky, Haas, Cohler & Munter, Barrie Engel, Hardin, Cook, Loper, Engel & Bergez, William Mathews Brooks and Brooks & Hughes for Defendants and Respondents.

OPINION

**RICHARDSON, J.**—The City of Oakland (City) appeals from a summary judgment dismissing with prejudice its action to acquire by eminent domain the property rights associated with respondent Oakland Raiders' (the Raiders) ownership of a professional football team as a franchise member of the National Football League (NFL). We conclude that the trial court erred in granting the summary judgment and we reverse and remand the case for a full evidentiary trial of the issues on the merits.

The Raiders limited partnership is comprised of two general partners, Allen Davis and Edward W. McGah, and several limited partners, all of whom are individual respondents herein. In 1966 the Raiders and the Oakland-Alameda County Coliseum, Inc., a nonprofit corporation, entered into a five-year licensing agreement for use of the Oakland Coliseum by the Raiders. Having been given five three-year renewal options, the Raiders exercised the first three, and failed to do so for the football season commencing in 1980 when contract negotiations for renewal terminated without agreement. When the Raiders announced its intention to move the football team to Los Angeles, City commenced this action in eminent domain.

The trial court granted summary judgment for all respondents and dismissed the action. The legal confrontation between the parties is sharply defined. City insists that what it seeks to condemn is "property" which is subject to established eminent domain law. City contends that whether it can establish a valid "public use" must await a determination

of the court after a full trial at which all relevant facts may be adduced. In answer, respondents argue that the law of eminent domain does not permit the taking of "intangible property not connected with realty," thereby rendering impossible City's condemnation of the football franchise which respondents describe as a "network of intangible contractual rights." Further, respondents claim that the taking contemplated by City cannot as a matter of law be for any "public use" within City's authority. Thus, two issues are herein presented, the first dealing with the intangible nature of the property proposed to be taken, and the second focusing on the scope of the condemning power as limited by the doctrine of public use. We consider them sequentially after acknowledging some accepted eminent domain principles of broad application.

We have held that "The power of eminent domain is an inherent attribute of sovereignty." (*County of San Mateo* v. *Coburn* (1900) 130 Cal. 631, 634 [63 P. 78, 621]; accord *City of Anaheim* v. *Michel* (1968) 259 Cal.App.2d 835, 837 [66 Cal.Rptr. 543]; *Anaheim Union High Sch. Dist.* v. *Vieira* (1966) 241 Cal.App.2d 169, 171 [51 Cal. Rptr. 94].) This sovereign power has been described as "universally" recognized and "necessary to the very existence of government." (1 Nichols on Eminent Domain (3d ed. 1980) §§ 1.11, 1.14[2], pp. 1-10, 1-22.) When properly exercised, that power affords an orderly compromise between the public good and the protection and indemnification of private citizens whose property is taken to advance that good. That protection is constitutionally ordained by the Fifth Amendment to the United States Constitution, which is made applicable to the states by nature of the Fourteenth Amendment (*Chicago, Burlington Sc. R'd.* v. *Chicago* (1897) 166 U.S. 226, 233-241 [41 L.Ed. 979, 983-986, 17 S.Ct. 581]) and by article I, section 19 of the California Constitution.

■ Because the power to condemn is an inherent attribute of general government, we have observed that "constitutional provisions merely place limitations upon its exercise." (*People* v. *Chevalier* (1959) 52 Cal.2d 299, 304 [340 P.2d 598].) The two constitutional restraints are that the taking be for a "public use" and that "just compensation" be paid therefor. (*Ibid.*; *City of Anaheim, supra*, 259 Cal.App.2d at p. 837.) No constitutional restriction, federal or state, purports to limit the nature of the property that may be taken by eminent domain. ■ In contrast to the broad powers of *general* government, however, "a municipal corporation has no inherent power of eminent domain and can exercise it only when expressly authorized by law. (*City of Menlo Park* v. *Artino* [1957] 151 Cal.App.2d 261, 266 ....)" (*City*

*of Anaheim, supra,* at p. 837.) We examine briefly the source of City's statutory power.

■ In 1975, California's eminent domain statutes received extensive revision and recodification. (See Code Civ. Proc., § 1230.010 et seq.; all further statutory references are to this code unless otherwise indicated; see also, e.g., Gov. Code, § 37350.5.) These changes were recommended by the California Law Revision Commission after it studied our existing eminent domain law and reviewed similar laws of every jurisdiction in the United States, pursuant to legislative direction. (See Eminent Domain Law, 13 Cal. Law Revision Com. Rep. (1975) pp. 1009-1011.) In the words of the commission, the new law was intended "to cover, in a comprehensive manner, all aspects of condemnation law and procedure" and to produce "a modern Eminent Domain Law within the existing California statutory framework." (*Id.,* at pp. 1010-1011.)

Certain provisions of the recodified law are particularly relevant to the issues before us. Government Code section 37350.5, as amended, provides: "A city may acquire by eminent domain *any property* necessary to carry out any of its powers or functions." (Italics added.) As newly defined, "'Property' includes real and personal property and any interest therein." (§ 1235.170.) In implementation of the foregoing right to take, the new code also authorizes any "person" empowered to take property for a particular use to exercise certain additional power to condemn other property "necessary to carry out and make effective the principal purpose involved . . . ." (*Id.,* § 1240.120, subd. (a); see *id.,* § 1240.110.) Within this context, "person" includes "any public entity" (*id.,* § 1235.160); and "public entity," in turn, includes a "city." (*Id.,* § 1235.190.) The constitutional obligation to pay compensation for property so taken also is codified. (See *id.,* § 1263.010, subd. (a).)

The new law appears to impose no greater restrictions on the exercise of the condemnation power than those which are inherent in the federal and state Constitutions. Further, the power which is statutorily extended to cities is not limited to certain types of property. In discussing the broad scope of property rights which are subject to a public taking under the new law, the Law Revision Commission comment notes that "Section 1235.170 is intended to provide the broadest possible definition of property and to include any type of right, title or interest in property that may be required for public use." (See Cal. Law Revision Com. com. to Code Civ. Proc., § 1235.170, Deering's Ann. Code Civ. Proc.

■■■■■■

(1981 ed.) p. 20.) To that end the commission eliminated the "duplicative listings of property types and interests subject to condemnation" which had appeared in the earlier eminent domain statutes. (*Ibid.*)

Despite the apparent lack of any constitutional or statutory restrictions, respondents nonetheless assert that "intangible property" such as the contractual and other rights involved in the instant action never before has been taken by condemnation, and that such taking should not be sanctioned now.

Initially, we note that the lack of precedent does not establish that the legal right to take intangibles is lacking. Further, while there is little applicable California law on the point, the Raiders, in our view, overstates its case.

Over 125 years ago, the United States Supreme Court rejected a similar claim that intangible property could not be condemned. In *The West River Bridge Company* v. *Dix et al.* (1848) 47 U.S. (6 How.) 507, 533 [12 L.Ed. 535, 546], the high court carefully explained: "A distinction has been attempted ... between the power of a government to appropriate for public uses property which is corporeal ... and the like power in the government to resume or extinguish a franchise. The distinction thus attempted we regard as a refinement which has no foundation in reason, and one that, in truth, avoids the true legal or constitutional question in these causes; namely, that of the right in private persons, in the use or enjoyment of their private property, to control and actually to prohibit the power and duty of the government to advance and protect the general good. We are aware of nothing peculiar to a franchise which can class it higher, or render it more sacred, than other property. A franchise is property, and nothing more; it is incorporeal property ...."

A century later, the high court reaffirmed the principle. Reasoning that "the intangible acquires a value ... no different from the value of the business' physical property," it concluded that such intangibles as trade routes of a laundry were condemnable, upon payment of just compensation therefor, when properly taken for a public use. (*Kimball Laundry Co.* v. *U. S.* (1949) 338 U.S. 1, 10-11, 16 [93 L.Ed. 1765, 1774-1775, 1777-1778, 69 S.Ct. 1434, 7 A.L.R.2d 1280].)

Respected treatise writers and commentators have been in full accord. Thus, "Personal property is subject to the exercise of the power of

eminent domain. Intangible property, such as choses in action, patent rights, franchises, charters or any other form of contract, are within the scope of this sovereign authority as fully as land .…" (1 Nichols, *supra*, § 2.1[2], pp. 2-8 to 2-9.) Similarly, "Unless restricted by constitutional or statutory provisions, the right of eminent domain encompasses property of every kind and character, whether real or personal, or tangible or intangible .…" (26 Am.Jur.2d, Eminent Domain, § 73, p. 733, fns. omitted.) Further, "the rule requiring compensation for property taken for or injured in connection with public use has been held to apply to personal property, such as valid contracts and contractual rights .…" (29A C.J.S., Eminent Domain, § 108, p. 440, fns. omitted.)

In considering the law of eminent domain within the context of inverse condemnation prior to the 1975 revision, one scholar has observed: "The constitutional provisions, both state and federal, make no verbal distinction between real property and personal property with respect to the requirement of 'just compensation.' Federal decisions under the due process clause have repeatedly applied inverse condemnation principles in cases involving both personalty and intangibles. *See, e.g.*, Armstrong v. United States, 364 U.S. 40 (1960) (destruction of materialmen's liens on boats held compensable taking); Monongahela Nav. Co. v. United States, 148 U.S. 312 (1893) (destruction of the value of a franchise held a compensable taking) .… [¶] The California decisions do not distinguish between real and personal property. [Citations.] … [¶] In any event, the state courts would necessarily have to yield to federal constitutional requirements in this regard, and, as noted above, takings of personalty are clearly compensable under the due process clause." (Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power* (1967) 19 Stan. L.Rev. 727, 739, fn. 50.)

Citing the foregoing discussion, the appellate court in *Sutfin v. State of California* (1968) 261 Cal.App.2d 50, 53 [67 Cal.Rptr. 665], reversed a lower court judgment in holding that under the forerunner to article I, section 19 of the California Constitution the taking or damaging of private property for public use was compensable, "whether said property be real or personal." (Fn. omitted.) Because condemnation and inverse condemnation, in our view, are merely different manifestations of the same governmental power, with correlative duties imposed upon public entities by the same constitutional provisions, both the *Sutfin*

holding and Professor Van Alstyne's discussion are pertinent to the case before us.

Following the reasoning of *Kimball, supra,* 338 U.S. 1, numerous other decisions both federal and state have expressly acknowledged that intangible assets are subject to condemnation. (See, e.g., *Liggett & Myers* v. *U. S.* (1927) 274 U.S. 215, 220 [71 L.Ed. 1006, 1008, 47 S.Ct. 581] [contract to provide tobacco products]; *Porter* v. *United States* (5th Cir. 1973) 473 F.2d 1329, 1333-1335 [right to exploit "collector's value" of personal effects of Lee Harvey Oswald]; *In re Fifth Avenue Coach Lines, Inc.* (1966) 18 N.Y.2d 212, 221 [273 N.Y.S.2d 52, 56, 219 N.E.2d 410] [bus system, including coach routes, operating schedules, etc.—"intangible assets are . . . equally essential to the city's" purpose]; *Milwaukee & Suburban Transport* v. *Milwaukee Cty.* (1978) 82 Wis.2d 420, 444 [263 N.W.2d 503, 516] [intangible assets connected with a bus service].) Similar consequences occur when a private utility is taken in eminent domain by a municipality or utility district (see, e.g., *Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805 [31 Cal.Rptr. 316, 382 P.2d 356]; *City of North Sacramento* v. *Citizens Utilities Co.* (1961) 192 Cal.App.2d 482 [13 Cal.Rptr. 538]); for the most valuable property acquired by condemnation of a utility may be intangible, namely, its franchise or right to do business. Indeed, the primary value of any *tangible* assets, real or personal, acquired in such a taking may well be that they serve that primary *intangible* right.

For eminent domain purposes, neither the federal nor the state Constitution distinguishes between property which is real or personal, tangible or intangible. Nor did the 1975 statutory revision do so. Bearing in mind that the Law Revision Commission, after an extensive national study, made its legislative recommendations, including a definition of condemnable property which it characterized as "the broadest possible," we conclude that our eminent domain law authorizes the taking of intangible property. Had the trial court based its summary judgment on a contrary conclusion, it would have erred.

In fairness, however, it must be said that the trial court fully acknowledged "the intent of the Legislature to allow the taking of any type of property, real or personal, if it was in fact necessary for a public use." But the court concluded as a matter of law that (1) no statutory or charter provision *specifically* authorized the taking of a professional football franchise, and (2) the operation of such a franchise is not a rec-

ognized public use which would permit its taking under *general* condemnation law. Assuming, for purposes of discussion, the propriety of the first premise, this fact alone is insufficient to support summary judgment; and we cannot agree with the second premise, which we now explore.

■ While broad, the eminent domain power is not unlimited. Section 1240.010 cautions: "The power of eminent domain may be exercised to acquire property only for a public use." (*People v. Chevalier, supra*, 52 Cal.2d 299, 304; *People v. Nahabedian* (1959) 171 Cal.App.2d 302, 308 [340 P.2d 1053].) Further, a public entity's taking may be challenged on the grounds that it (1) reflects a "gross abuse of discretion" (§ 1245.255, subd. (b)); (2) is arbitrary, capricious, totally lacking in evidentiary support, or in violation of the procedural requirements of the eminent domain law (§ 1245.255, subd. (a); see Cal. Law Revision Com. com. to Code Civ. Proc., § 1245.255, Deering's Ann. Code Civ. Proc. (1981 ed.) pp. 101-102); or (3) was the result of bribery (Code Civ. Proc., § 1245.270). On the other hand, the statutory authorization to utilize the power of eminent domain for a given "use, purpose, object, or function" constitutes a legislative declaration that the exercise is for a "public use." (§ 1240.010.)

Is it possible for City to prove that its attempt to take and operate the Raiders' football franchise is for a valid public use? We have defined "public use" as "a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1].) On the other hand, "It is not essential that the entire community, or even any considerable portion thereof, shall directly enjoy or participate in an improvement in order to constitute a public use." (*Fallbrook Irrigation District v. Bradley* (1896) 164 U.S. 112, 161-162 [41 L.Ed. 369, 389, 17 S.Ct. 56]; accord *University of So. California v. Robbins* (1934) 1 Cal.App.2d 523, 527-528 [37 P.2d 163].) Further, while the Legislature may statutorily declare a given "use, purpose, object or function" to be a "public use" (§ 1240.010), such statutory declarations do not purport to be exclusive.

Government Code section 37350.5, for example, authorizes a city to "acquire by eminent domain any property necessary to carry out any of its powers or functions." (See also § 1240.110.) The legislative comment to this section emphasizes that its "purpose is to give a city adequate authority to carry out its municipal functions." (See Cal. Law

Revision Com. com. to Gov. Code, § 37350.5, Deering's Ann. Gov. Code (1981 pocket supp.) p. 111.) Under certain circumstances, the governing body of a city may itself establish by resolution that a proposed taking is necessary for a project which is in the public interest. (See §§ 1240.030, 1240.040, 1245.250, subd. (a), 1245.255, subd. (b).) While the full effect of these statutes has yet to be construed judicially, the general statutory scheme would appear to afford cities considerable discretion in identifying and implementing public uses.

The United States Supreme Court established years ago, in another context, that "what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned." (*Fallbrook Irrigation District* v. *Bradley, supra*, 164 U.S. at pp. 159-160 [41 L.Ed. at pp. 388-389]; accord *University of So. California* v. *Robbins, supra*, 1 Cal.App.2d at pp. 527-528.) Further, "Public uses are not limited, in the modern view, to matters of mere business necessity and ordinary convenience, but may extend to matters of public health, recreation and enjoyment." (*Rindge Co.* v. *Los Angeles* (1923) 262 U.S. 700, 707 [67 L.Ed. 1186, 1193, 43 S.Ct. 689].) We have adopted a similar view. (*The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 450 [94 P.2d 794].)

■ No case anywhere of which we are aware has held that a municipality can acquire and operate a professional football team, although we are informed that the City of Visalia owns and operates a professional class A baseball franchise in the California League; apparently, its right to do so never has been challenged in court. In our view, several decisions concerning recreation appear germane. In *City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 434 [333 P.2d 745], we noted that a city's acquisition of a baseball field, with recreational facilities to be constructed thereon to be used by the city, was "obviously for proper public purposes." Similarly, in *County of Alameda* v. *Meadowlark Dairy Corp.* (1964) 227 Cal.App.2d 80, 84 [38 Cal.Rptr. 474, 48 A.L.R.3d 332], the court upheld a county's acquisition by eminent domain of lands to be used for a county fair, reasoning that "Activities which promote recreation of the public constitute a public purpose." (*Id.*, at p. 85.) Considerably earlier, in *Egan* v. *San Francisco* (1913) 165 Cal. 576, 582 [133 P. 294], in sustaining a city's power to build an opera house, we declared: "Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the

public is to be included within the legitimate domain of public purposes."

The examples of Candlestick Park in San Francisco and Anaheim Stadium in Anaheim, both owned and operated by municipalities, further suggest the acceptance of the general principle that providing access to recreation to its residents in the form of spectator sports is an appropriate function of city government. In connection with the latter stadium, the appellate court upheld the power of the City of Anaheim to condemn land for parking facilities at the stadium on the ground that "the acquisition, construction, and operation of a stadium by a county or city represents a legitimate public purpose. [Citations.]" (*City of Anaheim* v. *Michel, supra*, 259 Cal.App.2d at p. 839.)

Several of our sister jurisdictions are in accord. In *New Jersey Sports & Exposition Auth.* v. *McCrane* (1971) 119 N.J.Super. 457 [292 A.2d 580, 635-636, 641], a New Jersey court upheld an act creating a special public entity to build a sports complex, through eminent domain if necessary. The court observed that "the view that the construction and maintenance of stadiums and related facilities constitutes a public purpose has received virtually universal approval in most jurisdictions. [Citations.]" (292 A.2d at p. 598.) In affirming, the New Jersey Supreme Court agreed with the proposition which we indorsed in *Egan, supra*, 165 Cal. at page 582: namely, that anything calculated to promote the education or recreation of the people is a proper public purpose. (*N. J. Sports & Exposition Authority* v. *McCrane* (1972) 61 N.J. 1, 16 [292 A.2d 545, 552].)

In *Martin* v. *City of Philadelphia* (1966) 420 Pa. 14 [215 A.2d 894], the Pennsylvania Supreme Court sustained an ordinance which authorized a loan to construct a sports stadium, declaring: """A sports stadium is for the recreation of the public and is hence for a public purpose; for public projects are not confined to providing only the bare bones of municipal life, such as police protection, streets, sewers, light, and water; they may provide gardens, parks, monuments, fountains, libraries, [and] museums ...."""" (*Id.*, at p. 17 [215 A.2d at p. 896].) Indeed, as long ago as 1930 an Ohio appellate court discovered numerous examples of such publicly owned facilities across the country: "In fact, within the forty-eight states of the Union ninety-three municipal stadiums have been erected, or are in the process of erection ...." (*Meyer* v. *City of Cleveland* (1930) 35 Ohio App. 20 [171 N.E. 606, 607].)

Is the obvious difference between managing and owning the facility in which the game is played, and managing and owning the team which plays in the facility, legally substantial? To date, respondents have not presented a valid legal basis for concluding that it is, but we do not foreclose the trial court's reaching a different conclusion on a fuller record.

It has been said that "The concept of public purpose is a broad one .... To be serviceable it must expand when necessary to encompass changing public needs ...." (*Roe* v. *Kervick* (1964) 42 N.J. 191, 207 [199 A.2d 834, 842].) Stated another way, "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, [and] changing conceptions of the scope and functions of government ...." (*Barnes* v. *City of New Haven* (1953) 140 Conn. 8, 15 [98 A.2d 523, 527]; see 2A Nichols, *supra*, §§ 7.2, 7.21, pp. 7-18, 7-38 to 7-40.)

While it is readily apparent that the power of eminent domain formerly may have been exercised only to serve certain traditional and limited public purposes, such as the construction and maintenance of streets, highways and parks, these limitations seem merely to have corresponded to an accepted, but narrower, view of appropriate governmental functions then prevailing. The established limitations were not imposed by either constitutional or statutory fiat. Apparently acknowledging the evolving nature of public use, as we have noted, the Law Revision Commission specifically recommended against the retention of the list of possible public uses in the new law, explaining, "The scheme of the Eminent Domain Law renders a listing of public uses in the general condemnation statute, as under former Section 1238, unnecessary .... The state (Gov. Code, § 15853), cities (Gov. Code, § 37350.5) counties (Gov. Code, § 25350.5), and school districts (Ed. Code, § 1047) may exercise the power of eminent domain to acquire property necessary for any of their powers or functions." (See Cal. Law Revision Com. com. to Code Civ. Proc., § 1240.010, Deering's Ann. Code Civ. Proc. (1981 ed.) p. 24.)

From the foregoing we conclude only that the acquisition and, indeed, the operation of a sports franchise may be an appropriate municipal function. If such valid public use can be demonstrated, the statutes discussed herein afford City the power to acquire by eminent domain any property necessary to accomplish that use.

We caution that we are not concerned with the economic or governmental wisdom of City's acquisition or management of the Raiders' franchise, but only with the legal propriety of the condemnation action. In this period of fiscal constraints, if the city fathers of Oakland in their collective wisdom elect to seek the ownership of a professional football franchise are we to say them nay? And, if so, on what legal ground? Constitutional? Both federal and state Constitutions permit condemnation requiring only compensation and a public use. Statutory? The applicable statutes authorize a city to take "any property," real or personal, to carry out appropriate municipal functions. Decisional? Courts have consistently expanded the eminent domain remedy permitting property to be taken for recreational purposes.

■ Respondents advance the additional argument that even if it is proper for City to own a sports franchise, it cannot condemn an established team. While some statutes do explicitly prohibit the acquisition of an ongoing enterprise, there is no provision in present law which would preclude the taking contemplated by City. The Legislature knows how to be specific on the point. Government Code section 37353, subdivision (c), for example, provides that while a municipality may condemn land for use as a golf course, an existing golf course may not be acquired by eminent domain. By necessary implication, this statute would seem to suggest that the Legislature has recognized a municipality's broad eminent domain power to acquire an existing business unless expressly forbidden to do so. Such power, of course, had been exercised under previous law. (See, e.g., *Citizens Utilities Co. v. Superior Court, supra,* 59 Cal.2d 805 [operating public utility taken].) In the absence of some explicit prohibition that power survives the adoption of the extensive legislative changes of 1975.

Respondents urge, further, that because the NFL constitution bars a city from holding a franchise and being a member, the expenditure of any public monies for acquisition of the Raiders' franchise cannot be deemed in the public interest. On the other hand, an affidavit filed by the NFL commissioner avers that "a brief interim ownership" by City "would not be inconsistent with the NFL Constitution . . . ." ■ We, of course, are not bound by such an interpretation. Assuming its validity, however, respondents answer that if City contemplates the prompt transfer to private parties of the property interests which it seeks to condemn, after such brief ownership, that transfer would vitiate any legitimate "public use" which is a prerequisite to condemnation in the first place. (See *City & County of San Francisco v. Ross* (1955) 44

Cal.2d 52 [279 P.2d 529].) In turn, City points to the statute which, as previously noted, expressly authorizes that to which respondents object: "[A] person may acquire property under subdivision (a) with the intent to sell, lease, exchange or otherwise dispose of the property or an interest therein," provided such retransfer is made "subject to such reservations or restrictions as are necessary to protect or preserve the attractiveness, safety, and usefulness of the project." (§ 1240.120, subd. (b); see *Ross, supra*, 44 Cal.2d at p. 57; *City of Oakland* v. *Williams* (1929) 206 Cal. 315, 327-330 [274 P. 328]; *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 804 [266 P.2d 105].) So long as adequate controls are imposed upon any retransfer of the condemned property, there is no reason why the "public purpose" which justifies a taking may not be so served and protected. We envision that the adequacy of any such controls can only be determined within the factual context of a specific retransfer agreement.

■ The Raiders' final contention is that because a city is statutorily barred from condemning any property which is not "within its territorial limits" (see § 1240.050), City cannot acquire the partnership rights involved here which are not "located" in Oakland.

Several possible answers to the "territorial" argument suggest themselves. It is questionable whether this statute is relevant to intangible property, which can have no permanent situs. It is at least arguable that this section was intended to apply only to property which can and does have some situs, such as land and the rights related thereto. As the Raiders acknowledges, an intangible right has no territorial "situs in fact." We have noted that "'An intangible, unlike real or tangible personal property, has no physical characteristics that would serve as a basis for assigning it to a particular locality. The location assigned to it depends on what action is to be taken with reference to it.' (*Estate of Waits* [1944] 23 Cal.2d 676, 680 ....)" (*Atkinson* v. *Superior Court* (1957) 49 Cal.2d 338, 342-343 [316 P.2d 960].)

Even assuming its applicability here, however, any such restriction would appear to be met on the record before us. Oakland is the principal place of business of the partnership. It is the designated NFL-authorized site for the team's "home games." It is the primary locale of the team's tangible personalty. We readily acknowledge that there may be similar or additional factors which would be relevant in determining the appropriate scope of a city's power of condemnation. In fairness,

that power must have reasonable limitations. Prima facie, however, such territorial restrictions seem to be satisfied, although we most certainly do not preclude a trial court, on an appropriate factual record, from concluding otherwise.

Finally, section 1240.050's territorial limitation upon a municipality's exercise of its condemnation power is subject to an explicit exception which permits such exercise outside those limits when that power is "necessarily implied as an incident of one of its other powers." This exception codifies prior law, pursuant to which the power of extraterritorial condemnation has been acknowledged when necessary to implement local condemnation. (See *City of Beaumont* v. *Beaumont Irr. Dist.* (1965) 63 Cal.2d 291, 293 [46 Cal.Rptr. 465, 405 P.2d 377]; *City of North Sacramento* v. *Citizens Utilities Co., supra,* 192 Cal.App.2d at p. 487.)

Whether the action proposed by City here is governed by section 1240.050 and, if so, whether it falls within the territorial limitation or the exception thereto, like the other factual and legal issues hereinabove noted, are matters which require a trial court's inquiry. Such issues are clearly material in determining whether City's proposed exercise of its power of eminent domain is proper and reasonable. Further, the facts and circumstances developed at a trial may be of substantial assistance in the formulation of any appropriate limitations on the exercise of such power.

In further support of the public purpose sought to be served by the proposed condemnation, City refers to economic studies and governmental reports which allegedly bear upon that purpose. Additionally, City asserts that the factual circumstances surrounding the construction of the Oakland Coliseum and the integration of the past use of the stadium with the life of the City of Oakland in general will readily demonstrate the "public" nature of the use contemplated here. Respondents, in turn, essentially deny City's contentions. The advisability of a full factual hearing on these conflicting claims thus becomes apparent.

Our conclusion requiring a trial on the merits is reinforced by the long recognized and fundamental importance of the "facts and circumstances" of each case in determining whether a proposed use is a proper public use. (*Fallbrook Irrigation District* v. *Bradley, supra,* 164 U.S. at pp. 159-160 [41 L.Ed. at pp. 338-339]; *Linggi* v. *Garovotti* (1955) 45

Cal.2d 20, 24 [286 P.2d 15]; *Lindsay I. Co. v. Mehrtens* (1893) 97 Cal. 676, 680 [32 P. 802]; *University of So. California v. Robbins, supra*, 1 Cal.App.2d at pp. 527-528.) City and the Raiders should be afforded a full opportunity before a trial court to present the "facts and circumstances" of their respective sides during a trial on the merits. That opportunity was, of course, foreclosed by the trial court's entry of summary judgment dismissing the action.

In its petition for rehearing, the Raiders reasserts its view that a professional football franchise is not a proper subject for eminent domain. We repeat what is necessarily implicit in our opinion: Under the present statutory scheme, the courts have no authority to choose those items of property which they deem appropriate for condemnation. Our Legislature has unambiguously decreed that "A city may acquire by eminent domain *any property* necessary to carry out any of its powers or functions." (Italics added; Gov. Code, § 37350.5; see Code Civ. Proc., § 1235.170.) Moreover, we do not decide whether City has a meritorious condemnation claim in this case. City's ability to prove a valid public use for its proposed action remains untested. We hold only that City should be given the opportunity to prove its case in accordance with the established legal principles outlined in our opinion.

We reverse and remand the case to the trial court for further proceedings not inconsistent with this opinion.

Mosk, J., Newman, J., Kaus, J., and Reynoso, J.,* concurred.

**FEINBERG, J.***—I concur in the judgment; I also agree with much of the Chief Justice's concurring and dissenting opinion.

**BIRD, C. J.,** Concurring and Dissenting.—The power of eminent domain claimed by the City in this case is not only novel but virtually without limit. This is troubling because the potential for abuse of such a great power is boundless. Although I am forced by the current state of the law to agree with the result reached by the majority, I have not signed their opinion because it endorses this unprecedented application of eminent domain law without even pausing to consider the ultimate consequences of their expansive decision. It should be noted that research both by the parties and by this court has failed to disclose a

---

*Assigned by the Chairperson of the Judicial Council.

single case in which the legal propositions relied on here have been combined to reach a result such as that adopted by the majority.

There are two particularly disturbing questions in this case. First, does a city have the power to condemn a viable, ongoing business and sell it to another private party merely because the original owner has announced his intention to move his business to another city? For example, if a rock concert impresario, after some years of producing concerts in a municipal stadium, decides to move his productions to another city, may the city condemn his business, including his contracts with the rock stars, in order to keep the concerts at the stadium? If a small business that rents a storefront on land originally taken by the city for a redevelopment project decides to move to another city in order to expand, may the city take the business and force it to stay at its original location? May a city condemn *any* business that decides to seek greener pastures elsewhere under the unlimited interpretation of eminent domain law that the majority appear to approve?

Second, even if a city were legally able to do so, is it proper for a municipality to drastically invade personal property rights to further the policy interests asserted here?

The rights both of the owners of the Raiders and of its employees are threatened by the City's action. Thus, one unexplored aspect of the majority's decision is the ruling that contract rights can be taken by eminent domain. The cases relied on by the majority in support of this holding chiefly concerned inverse condemnation suits. Those cases essentially held that when a state condemns a business, the government is obligated to compensate the business owner for the value of the contract rights destroyed by the taking. In this case, the City seeks to condemn employment contracts between the Raiders and dozens of its employees. Can the City acquire personal employment contracts as simply as it can acquire a tract of land? Are an employee's rights violated by this non-consensual taking of an employment contract or personal services agreement?

At what point in the varied and complex business relationships involved herein would this power to condemn end? In my view, this court should proceed most cautiously before placing a constitutional imprimatur upon this aspect of creeping statism. These difficult questions are deserving of more thorough attention than they have yet received in this litigation.

It strikes me as dangerous and heavyhanded for the government to take over a business, including all of its intangible assets, for the sole purpose of preventing its relocation. The decisional law appears to be silent as to this particular question. It appears that the courts have not yet been confronted with a situation such as that presented by this case. However, a review of the pertinent case law demonstrates that decisions as to the proper scope of the power of eminent domain generally have been considered legislative, rather than judicial, in nature. Therefore, in the absence of a legislative bar to the use of eminent domain in this manner, there appears to be no ground for judicial intervention.

The power to take private property through eminent domain has been denominated "one of the indisputable attributes of sovereignty. [Citations.]" (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 282 [289 P.2d 1].) The only specific constitutional limitations on that power appear to be that (1) property must be taken to further a public purpose, and (2) just compensation must be paid to the property owner. (Cal. Const., art. I, § 19; U.S. Const., 14th Amend.; *People* v. *Chevalier* (1959) 52 Cal.2d 299, 306 [340 P.2d 598].)

It is well-settled that the judiciary should defer to a legislative determination that a particular usage of property is for a valid public purpose. "Without doubt it is the general rule that where there is any doubt whether the use to which the property is proposed to be devoted is of a public or private character, it is a matter to be determined by the Legislature and the courts will not undertake to disturb its judgment in this regard." (*Con. Channel Co.* v. *C. P. R. R. Co.* (1876) 51 Cal. 269, 273.) Here, it is clear from the case law that "recreation" has been found to be a legitimate public purpose.

In addition, the courts have traditionally refused to examine whether the taking of a particular piece of property is *necessary* for an asserted public purpose. If the object of the legislative program is properly within the parameters of that body's authority, questions concerning the proper means used to reach that particular end (what property to take, how much, what to do with the property after it is taken) are generally left to the legislative branch of the government. (See Code Civ. Proc., § 1245.250.) Once again, judicial review is limited. The court may not second-guess the City's determination that condemnation of the Raiders is "necessary."

In California, the Legislature has narrowly defined court review in this area. Whether a taking is necessary to achieve a public purpose is reviewable only on specific and narrow grounds. (A court may consider only whether a taking (1) reflects a "gross abuse of discretion" (*id.,* § 1245.255, subd. (b)); (2) is arbitrary, capricious, totally lacking in evidentiary support, or in violation of the procedural requirements of the eminent domain law (*id.,* § 1245.255, subd. (a); see Cal. Law Revision Com. com. to Code Civ. Proc., § 1245.255, Deering's Ann. Code Civ. Proc. (1981 ed.) pp. 101-102); or (3) was the result of bribery (Code Civ. Proc., § 1245.270).)

As a result, the wisdom of the City's decision here may not be successfully challenged in the courts unless it can be shown that the municipality acted in an arbitrary or capricious fashion, or its act represents a "gross abuse of discretion." Given this present state of the law, on this limited record, respondents have not demonstrated that there has been a violation of these standards. Unless it can be shown that the City's decision to use its power of eminent domain in this fashion was completely irrational, there is no relief available for respondents in the courts. Any relief must come from legislatively imposed restrictions.

The court is further constrained because this case is before us on appeal from a dismissal entered after the granting of a motion for summary judgment. On such an appeal, this court must give the benefit of any doubt to the City. Given the far-reaching potential of this decision, a final conclusion as to the legal validity of the City's action should await a full record and complete factual presentation.

At this stage of the proceedings, there is no constitutional or statutory ground for barring the City's action. Despite my serious misgivings about the wisdom of the City's action and the possible future ramifications of a holding that the state has the power to take an ongoing business to prevent it from leaving a particular area, I am constrained by the law to join, albeit reluctantly, the judgment entered here.

Respondents' petition for a rehearing was denied August 5, 1982. Broussard, J., did not participate therein.