[No. A029031. First Dist., Div. Four. Nov. 15, 1985.]

CITY OF OAKLAND, Plaintiff and Appellant, v.
OAKLAND RAIDERS et al., Defendants and Respondents.

COUNSEL

David A. Self, Self, Dang & Kelson, Horan, Lloyd & Karachale, Laurence P. Horan, Michael W. Stamp and Richard E. Winnie, City Attorney, for Plaintiff and Appellant.

Moses Lasky, John E. Munter, Lasky, Haas, Cohler & Munter, William Mathews Brooks, Brooks & Hughes, Barrie Engel, Hardin, Cook, Loper, Engel & Bergez, Gary R. Netzer, Ira Reiner and James K. Hahn, City Attorneys, Edward C. Dygert, Deputy City Attorney, De Witt W. Clinton, County Counsel, and Dennis M. Devitt, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**SABRAW, J.**—Plaintiff City of Oakland appeals from a judgment after a court trial in favor of defendants Oakland Raiders et al. We have determined that plaintiff's proposed exercise of eminent domain power would, in this case, violate the commerce clause of the United States Constitution. Accordingly, we affirm.

### I. Facts and Procedure

Plaintiff sued in 1980 to acquire by eminent domain the property of defendants Oakland Raiders (Raiders), a National Football League (NFL or League) franchise. The Alameda County Superior Court issued a preliminary injunction prohibiting transfer of the franchise from Oakland, the case was transferred to Monterey County (Code Civ. Proc., § 394), and summary judgment was entered for defendants. On appeal the Supreme Court reversed, holding our eminent domain statute allowed condemnation of in-

tangible property and that plaintiff had a right to show whether its attempted exercise of eminent domain over the Raiders franchise would be a valid public use. (*City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60 [183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208] [*Raiders I*].) We subsequently granted a peremptory writ of mandate directing the trial court to hold a hearing on plaintiff's application for reinstatement of the preliminary injunction against transfer of the franchise from Oakland. (*City of Oakland* v. *Superior Court* (1982) 136 Cal.App.3d 565 [183 Cal.Rptr. 326] [*Raiders II*].) In the meantime, however, Raiders home games were played in Los Angeles. In early 1983 the trial court reinstated and modified the injunction against transfer, providing that all 1983 Raiders home games for the 1983 season would be played in Oakland "unless and until judgment after trial is entered in favor of [d]efendants before the beginning of the 1983 season." After trial in May 1983 the court entered judgment against plaintiff. Following various procedural maneuvers by plaintiff we issued an alternative writ of mandate, denied plaintiff's requested stay of judgment, and eventually issued a writ of mandate ordering the trial court to (i) vacate its judgment and (ii) proceed to determine those remaining objections to plaintiff's eminent domain action that it had not previously ruled on. (*City of Oakland* v. *Superior Court* (1983) 150 Cal.App.3d 267, 279-280 [197 Cal.Rptr. 729] [*Raiders III*].)

On remand the court again entered judgment for defendants. Its decision is based primarily on three independent grounds: (1) that plaintiff's stated purpose is not a public use; (2) that plaintiff's action is invalid under federal antitrust law; and (3) that plaintiff's action is invalid under the commerce clause of the federal constitution.

## II. Analysis

We turn first to the trial court's commerce clause determination. ■ United States Constitution, article I, section 8, clause 3, grants Congress the power "[t]o regulate commerce . . . among the several States . . . ." This provision was intended to foster development and maintenance of a national common market among the states and to eradicate trade barriers. (See, e.g., *Baldwin* v. *G.A.F. Seelig* (1935) 294 U.S. 511, 523 [79 L.Ed. 1032, 1038, 55 S.Ct. 497] ["The Constitution was framed . . . upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division."]) Indeed, "[r]ecognition of [this] predominant goal . . . has permeated judicial interpretations of state power to regulate commerce." (Nowak, Rotunda & Young, Constitutional Law (2d ed. 1983) 267-268.)

■ It is today established that state or local regulation of interstate commerce will be upheld if it " 'regulates evenhandedly to effectuate a legiti-

mate local public interest, and its effects on interstate commerce are only incidental . . . unless the burden imposed on such commerce is clearly excessive in relation to putative local benefits.'" (*Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 640 [73 L.Ed.2d 269, 282, 102 S.Ct. 2629], quoting *Pike* v. *Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178-179, 90 S.Ct. 844].) Still, "experience teaches that no single conceptual approach identifies all of the factors that may bear on a particular [commerce clause] case." (*Raymond Motor Transp., Inc.* v. *Rice* (1978) 434 U.S. 429, 440-441 [54 L.Ed.2d 664, 674-675, 98 S.Ct. 787].) One additional, albeit less recently relied-on approach to review of state or local action under the commerce clause provides that burdens will be voided if the regulation governs "those phases of the national economy which, because of the need of national uniformity, demand their regulation, if any, be prescribed by a single authority." (*Southern Pacific Co.* v. *Arizona* (1945) 325 U.S. 761, 767 [89 L.Ed. 1915, 1923, 65 S.Ct. 1515]; see also *Edwards* v. *California* (1941) 314 U.S. 160, 176 [86 L.Ed. 119, 126-127, 62 S.Ct. 164]; *Minnesota Rate Cases* (1913) 230 U.S. 352, 399-400 [57 L.Ed. 1511, 1541, 33 S.Ct. 729]; *Leisy* v. *Hardin* (1890) 135 U.S. 100, 108-109 [34 L.Ed. 128, 132, 10 S.Ct. 681]; *Cooley* v. *Board of Wardens* (1852) 53 U.S. (12 How.) 299, 319 [13 L.Ed. 996, 1004-1005].) The absence of congressional action respecting such economic matters is not controlling because, as has been long established, the commerce clause limits state power by its own force. (*South Carolina State Highway Dept.* v. *Barnwell Bros.* (1938) 303 U.S. 177, 185-186 [82 L.Ed. 734, 739, 58 S.Ct. 510]; *Cooley* v. *Board of Wardens, supra,* 53 U.S. (12 How.) 299; see generally *Edgar* v. *MITE Corp., supra,* 457 U.S. 624, 640 [73 L.Ed.2d 269, 281-282].)

Plaintiff claims, as a preliminary matter, that it cannot be subject to commerce clause review for three reasons. First, it asserts, such review is precluded by the law of the case doctrine—which generally binds all subsequent proceedings, trial or appellate, to prior appellate determinations in the same action—because defendants raised the commerce clause issue in their petition for rehearing in *Raiders I.* ■ Law of the case doctrine, however, does not extend to points of law that might have been but were not presented *and determined* on a prior appeal. (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179 [18 Cal.Rptr. 369, 367 P.2d 865], and cases cited.) Because the briefs in *Raiders I* contained nothing on the commerce clause issue and because denial of rehearing decides nothing on points raised for the first time in the rehearing petition (*County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 513 [138 Cal.Rptr. 472, 564 P.2d 14]), law of the case did not preclude commerce clause review in the trial court.

■ Second, plaintiff asserts it is exempt from scrutiny under the commerce clause because it has merely attempted to enter the market as a par-

ticipant, not a regulator. (See *South-Central Timber Development, Inc.* v. *Wunnicke* (1984) 467 U.S. 82, 91-93 [81 L.Ed.2d 71, 79-80, 104 S.Ct. 2237, 2243]; *White* v. *Massachusetts Council of Const. Employers* (1983) 460 U.S. 204, 206-208 [75 L.Ed.2d 1, 4-6, 103 S.Ct. 1042]; *Reeves, Inc.* v. *Stake* (1980) 447 U.S. 429, 436-437, 440 [65 L.Ed.2d 244, 251, 253, 100 S.Ct. 2271]; *Hughes* v. *Alexandria Scrap Corp.* (1976) 426 U.S. 794, 809-810 [49 L.Ed.2d 220, 231, 96 S.Ct. 2488].) Although plaintiff would escape commerce clause review if it had in fact acted as a mere market participant—i.e., if it had attempted to enter the football market on an equal footing, bidding with other potential market participants and seeking to purchase from someone willing and able to sell—it does not escape commerce clause review in this situation in which its action is grounded on its governmental power of eminent domain that it possesses as an agent of a sovereign, the State of California.[1] (Cf. *Reeves* v. *Stake, supra,* 447 U.S. 429, 437 [65 L.Ed.2d 244, 251] [commerce clause applies to "actions taken by states in their sovereign capacity" but does not limit proprietary activity].) Here the city does not even cross the threshold of the marketplace except by first exercising what has been characterized as a sovereign's "most awesome grant of power"—eminent domain. (*Winger* v. *Aires* (1952) 371 Pa. 242, 244 [89 A.2d 521, 522].)

Third, plaintiff contends exercise of eminent domain power can never violate the commerce clause and notes that no previous case has precluded an eminent domain taking under that constitutional provision. The lack of such case law, however, is unremarkable; it serves merely to point out that eminent domain cases have traditionally concerned real property, rarely implicating commerce clause considerations which deal primarily with products in the flow of interstate commerce. Whether the commerce clause precludes taking by eminent domain of intangible property, however, is a novel question posed, it seems, for the first time in this case.[2]

■ It is well established that a state may exercise eminent domain power even though by so doing it indirectly or incidentally burdens interstate commerce. (See *Elberton Southern Ry. Co.* v. *State Highway Dept.* (1955) 211 Ga. 838, 841 [89 S.E.2d 645, 649], and cases cited.) ■ Defendants, however, contend that professional football is such a nationwide business and so completely involved in interstate commerce that acquisition of a franchise by an individual state through eminent domain would impermis-

---

[1]Cities, unlike states, lack inherent power to condemn. (*Raiders I, supra,* 32 Cal.3d at pp. 64-65; Comment, *Anticipating an Instant Replay: City of Oakland* v. *Oakland Raiders* (1984) 17 U.C. Davis L.Rev. 963, 976.)

[2]Contrary to plaintiff's urgings, nothing in *Hayfield Northern R.* v. *Chicago & N.W. Transp.* (1984) 467 U.S. 622 [81 L.Ed.2d 527, 104 S.Ct. 2610], persuades us that the eminent domain action here is exempt from commerce clause analysis.

sibly burden interstate commerce. A recent Supreme Court decision, *Partee* v. *San Diego Chargers Football Co.* (1983) 34 Cal.3d 378 [194 Cal.Rptr. 367, 668 P.2d 674], supports this view.

*Partee* held that the NFL required nationally uniform regulation and that interstate commerce would be unreasonably burdened if state antitrust laws applied to a League franchise located in this state. Uniform nationwide regulation was called for because "Professional football's teams are dependent upon the league playing schedule for competitive play . . . . The necessity of a nationwide league structure for the benefit of both teams and players for effective competition is evident as is the need for a nationally uniform set of rules governing the league structure. Fragmentation of the league structure on the basis of state lines would adversely affect the success of the competitive business enterprise, and differing state antitrust decisions if applied to the enterprise would likely compel all member teams to comply with the laws of the strictest state." (*Id.,* at pp. 384-385.)

The same situation is presented here. Indeed, the trial court's findings track and amplify on *Partee.* Regarding the interdependent character of the NFL, the court noted that each member team is substantially dependent for its income on every other team: League television contract proceeds are divided equally and gate receipts nearly equally; a team's drawing power is therefore a financial benefit to the other teams as well as to itself; hence the capacity and quality of the facility in which games are played is a component of the League's financial success. The court also found evidence of the necessity of a nationwide League structure: based on the above factors, each League franchise owner has an important interest in the identity, personality, financial stability, commitment, and good faith of each other owner. Thus, under League bylaws, new members must first be approved by the current members. In short, although the clubs compete to an important degree, the League is also a joint venture of its members organized for the purpose of providing entertainment nationwide. Finally, the court found that a bar to relocation on the basis of state eminent domain law would adversely affect the League enterprise. An involuntarily acquired franchise could, at the local government's pleasure, be permanently indentured to the local entity. The League's interests would be subordinated to, or at least compromised by, the new owner's allegiance to the local public interest in matters such as lease agreements, ticket prices, concessions, stadium amenities, scheduling conflicts, etc. As the trial court found, it must also be anticipated that a single precedent of eminent domain acquisition would pervade the entire League, and even the threat of its exercise elsewhere would seriously disrupt the balance of economic bargaining on stadium leases throughout the nation.

Plaintiff's proposed action would more than indirectly or incidentally regulate interstate commerce: plaintiff claims authority—pursuant to authorization found in state eminent domain statutes—to bar indefinitely defendant's business from relocating out of Oakland. This is the precise brand of parochial meddling with the national economy that the commerce clause was designed to prohibit.

As shown above, relocation of the Raiders would implicate the welfare not only of the individual team franchise, but of the entire League. The spectre of such local action throughout the state or across the country demonstrates the need for uniform, national regulation. In these circumstances (and apart from other potential bases of commerce clause violation),[3] if relocation threatens disproportionate harm to a local entity, regulation—if necessary—should come from Congress;[4] only then can the consequences to interstate commerce be assessed and a proper balance struck to consider and serve the various interests involved in a uniform manner. (*Partee* v. *San Diego Chargers Football Co., supra,* 34 Cal.3d 378, 385.)

Our Supreme Court in *Partee* held this state's legitimate interest in enforcing our own antitrust laws against a League franchise was outweighed by the burden such enforcement would impose on interstate commerce. Plaintiff here does not seek to promote the health or safety of its citizens, or even, as in *Partee,* promote fair economic competition. Instead it seeks to act for what may be presumed, for purposes of analysis, to be legitimate, but less compelling reasons: to promote public recreation, social welfare,

---

[3]It might be argued that plaintiff's attempted exercise of eminent domain would be analogous to a local embargo or prohibition of outgoing commerce—a practice frequently designated a per se violation of the commerce clause. (Nowak, Rotunda & Young, *supra,* pp. 284, 286-287; see also Note (1983) 4 Pace L.Rev. 169, 191-192 [eminent domain acquisition of the Raiders would impermissibly burden interstate commerce by reducing the number of businesses that pass through such commerce].) The trial court touched on a similar point when it stated, "it would seem essential to the welfare of any business in a free enterprise system that it be substantially free to relocate to a better economic environment to maintain or enhance its viability." (Cf., *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 111-121 [207 Cal.Rptr. 285, 688 P.2d 894], and cases cited (Mosk J., dissenting) [discussing an individual's right to go out of business]; *Pike* v. *Bruce Church, Inc., supra,* 397 U.S. 137, 145 [25 L.Ed.2d 174, 180] ["the Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere"].) Whether such a broadly stated proposition may ultimately prove correct, however, need not be decided here. We are not faced with the question of whether, consistent with the commerce clause, a local government may prevent relocation of a business that, although producing goods that eventually flow in interstate commerce, is not an interdependent component part of an interstate joint venture such as the NFL.

[4]Note, *The Constitutionality of Taking a Sports Franchise by Eminent Domain and the Need for Federal Legislation to Restrict Franchise Relocation* (1985) 13 Fordham Urban L.J. 553.

and to secure related economic benefits, as well as to best utilize the stadium in which the Raiders played.

We conclude, as did *Partee* in a similar context, that the burden that would be imposed on interstate commerce outweighs the local interest in exercising statutory eminent domain authority over the Raiders franchise.

Our conclusion on the commerce clause obviates the need for further consideration of the public use and antitrust arguments.

Judgment is affirmed.

Anderson, P. J., and Channell, J., concurred.

A petition for a rehearing was denied December 12, 1985, and appellant's petition for review by the Supreme Court was denied February 27, 1986. Broussard, J., and Panelli, J., did not participate therein. Reynoso, J., was of the opinion that the petition should be granted.